# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| KELLY BIRES, | ) | |
| *Plaintiff* | ) ) ) | |
| v. | ) ) | **CASE NO. 1:07-CV-00959-JAB-WWD** |
| WALTOM, LLC D/B/A WALTOM RACING, LLC | ) ) ) | |
| *Defendant* | ) ) ) | |

## MEMORANDUM IN OPPOSITION TO MOTION TO TRANSFER VENUE

Plaintiff Kelly Bires (hereinafter referred to as "Plaintiff," "Bires" or "Plaintiff Bires") hereby submits this Memorandum of Law in Opposition to Defendant WalTom, LLC d/b/a WalTom Racing, LLC's (hereinafter referred to as "Defendant," "WalTom" or "Defendant WalTom") Motion to Transfer Venue pursuant to 28 U.S.C. § 1404(a).

### INTRODUCTION

This matter involves a dispute between Plaintiff Bires and Defendant WalTom concerning the validity and/or enforceability of a document that was originally attached as Exhibit A to Plaintiff's Complaint filed in the Superior Court of Rowan County and was subsequently attached as Exhibit 1 to Defendant's Motion to Transfer Venue. That document will be hereinafter referred to as "the contract at issue." A copy of the Complaint filed in the Superior Court of Rowan County and its attachments are included as Exhibit 1 hereto.

This action was filed as a North Carolina state law claim, pursuant to North Carolina General Statute § 1-253, *et seq.*, for declaratory judgment seeking a declaration from the Superior Court of Rowan County that the contract at issue is, as stated in the Plaintiff's Complaint, "void, invalid and unenforceable as it, *inter alia*, is unconscionable, fails for a lack of consideration or [] the consideration is grossly

inadequate [,] there was no meeting of the minds, the parties did not agree as to the essential terms of [the contract at issue] [the contract at issue] is otherwise too vague or uncertain in many of its terms to be enforceable," the Defendant had superior bargaining power and the contract was otherwise non-negotiable. *See* Complaint, Exhibit 1 at ¶ 37-41. The Defendant removed this matter to this Court based on diversity of citizenship and has now moved that this Court transfer the matter to the United States District Court for the Northern District of Illinois.

## FACTUAL BACKGROUND

As more particularly stated in Plaintiff's Complaint filed in the Superior Court of Rowan County, Exhibit 1 hereto, all of which is incorporated herein by reference, and as stated in the Affidavit of Kelly Bires, Exhibit 2 hereto, which is also incorporated by reference herein, the underlying facts giving rise to the initiation of a declaratory judgment action by Plaintiff Bires concern an agreement by and between Bires and WalTom for Bires to provide professional race car driving services for WalTom in the 2006 ASA season. As admitted by WalTom in the Declaration of WalTom General Manager John Mulvenna, "following [the Hudson, North Carolina] testing in late 2005, WalTom selected Plaintiff, Kelly Bires, to be its driver for the 2006 season. ***Plaintiff accepted WalTom's offer to be its driver***." Mulvenna Decl., Exhibit A to Defendant's Motion to Transfer at ¶ 9; *see also* Def.'s Memo in Support of Motion to Transfer at p. 2. (emphasis added).

Thus, just as Plaintiff has contended all along and as specifically pled in Plaintiff's Complaint, the real agreement that was entered into by and between Plaintiff and Defendant occurred as a result of WalTom's offer to Bires to drive for WalTom and Bires acceptance of the same. Subsequent to the actions of offer and acceptance admitted by Mulvenna and thus formation of a contract to provide professional race car driving services, WalTom, an established racing team in the MidWest, presented Bires, a young race car driver who had already moved to WalTom's Wisconsin location and had already begun working for WalTom in the race shop (*see* Exhibit 3), with a lengthy document purporting to be a

2

contract. As stated in the Complaint and in Bires' Affidavit, Bires was forced to sign the document and was told that WalTom would give the driving position that had already been accepted by Bires to another candidate. In so doing, WalTom was clearly asserting its overwhelmingly greater bargaining power in overreaching and having Bires sign the contract at issue and all of its provisions.

The agreement for Bires to drive for WalTom was initiated in North Carolina with the Hudson, North Carolina driving test. As stated by WalTom in the Declaration of Mulvenna, it was after that North Carolina testing that an offer was accepted by Bires for Bires to drive for WalTom. Bires then drove the 2006 ASA Season out of the WalTom race shop in Wisconsin and lived and worked for WalTom in Wisconsin. The contract at issue calls for royalties payments to WalTom for any of Bires' NASCAR-related business ventures. By necessity, any such NASCAR-related business ventures of Bires will concern, occur in or be substantially related to the State of North Carolina, as his current team and probably all future NASCAR teams for which he may work are based in North Carolina.

On the contrary, the only connection to the State of Illinois or the Northern District of Illinois is WalTom's corporate office, the residency of WalTom's officers and the residency of one of its attorneys. The WalTom race shop that is at issue is not located in Illinois, there were no actions undertaken in Illinois that are relevant to this matter and there are no actions that would or might in the future occur in Illinois that would or might give rise to any obligation for the payment of royalties to WalTom even if the contract at issue were deemed valid and enforceable.

There is not even an allegation that the contract at issue was executed by the Plaintiff in the State of Illinois. Rather, WalTom alleges that the contract at issue was signed by the Plaintiff in the state of Wisconsin. *See* Def.'s Memo in Support of Motion to Transfer at p. 3. The actual contract between the parties, as admitted by the Declaration of John Mulvenna and the Memorandum of the Defendant which cites the same, was accepted by Bires in North Carolina prior to signing the contract at issue and thus WalTom's assertion that the contract at issue, the

3

entire validity and enforceability of which is the heart of this matter, was executed or signed by one party in Illinois and the other party in Wisconsin is, in any event, of little or no significance in this matter.

There is no dispute in this matter that all parties performed per the terms of the parties initial, original and actual agreement. Bires provided WalTom with professional driving and other racing related services for the 2006 racing season with WalTom receiving, additionally, various race purse winnings and other accolades and Bires receiving a salary and a percentage of race earnings. This suit does not involve that agreement. It, instead, involves the validity of the subsequently signed document that is a contract to purportedly to do something the parties were already under a legal obligation to do. For those and other reasons, the Plaintiff filed this action seeking declaration judgment, pursuant to a North Carolina statute, that the contract at issue is invalid and unenforceable.

## **ARGUMENT**

### A.    **THIS COURT SHOULD RETAIN THIS ACTION IN THE MIDDLE DISTRICT OF NORTH CAROLINA**

Pursuant to 28 U.S.C. § 1404(a), "[f]or the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it may have been brought." 28 U.S.C. § 1404(a). However, in considering a motion to transfer under section 1404(a), "the plaintiff's choice of forum is accorded great weight." *Walter Kidde Portable Equip., Inc. v. Universal Sec. Instruments, Inc.,* 304 F. Supp. 2d 769, 773 (M.D.N.C. 2004) (citing *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 255-56 (1981)). "The Fourth Circuit has recognized that a change of venue requires a weighing of factors and that 'unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed.'" *Tools USA and Equipment Co. v. Champ Frame Straightening Equipment, Inc.,* 841 F.Supp. 719, 721 (M.D.N.C. 1993) (internal citations omitted).

4

There are various factors to determine whether venue should be transferred including the plaintiff's initial choice of venue, the residences of the parties, the ease of proof, the availability of compulsory process, the costs of obtaining attendance of willing witnesses, the relative time and expense of travel, and the interest of localized litigation. *Id.* (internal citations omitted). In the exercise of its discretion on these factors as to a transfer of venue under 1404(a), the Court should, however, keep in mind that the plaintiff's choice of forum carries significant weight and that a transfer of venue is not appropriate if the transfer merely shifts the burdens of litigation from one party to another. *Precept Medical Products, Inc. v. Klus*, 282 F. Supp. 2d 381, 388 (W.D.N.C. 2003) (internal citations omitted) (declining to transfer venue based on shifting of inconveniences from defendant to plaintiff where defendant had not claimed he would be able to have his witnesses attend a trial in North Carolina nor claimed that he would not have access to the necessary sources of proof if trial was held in North Carolina). "[A] court should not transfer venue if the transfer 'would simply shift the inconvenience from one party to another.'" *Id.* (citing *Tools USA.,* 841 F.Supp. at 721).

Inasmuch as the State of Illinois has virtually no tie to this matter, while, on the other hand, matters and occurrences in the State of North Carolina are substantially tied to this matter, Plaintiff's choice of North Carolina as the forum should be upheld. While the Defendant cites a Northern District of California case for the proposition that litigation should proceed where the case finds its "center of gravity," the center of gravity in this matter is almost anywhere but Illinois and is, actually, here in North Carolina where this matter was originally filed by the Plaintiff. Furthermore, to transfer this matter to the Northern District of Illinois would merely shift the inconveniences to the Plaintiff and therefore would be improper.

In finding that transferring venue to the Central District of California would merely shift the inconveniences of location of trial to the plaintiff who chose to have its case heard in the Middle District of North Carolina, this court in the *Tools USA* case found that the Defendant "reside[d]" within the

Middle District of North Carolina and availed itself of suit in North Carolina by virtue of "'doing business'" in North Carolina. *Tools USA* 841 F.Supp. at 721.   Importantly, this Court in the *Tools USA* case refused to transfer the matter to California where the defendant notified the court of one witness from California which it expected to call at trial but all other statements by the defendant merely expressed inconveniences with the Middle District of North Carolina which arose simply because the Defendant was a California corporation with employees and officers in California. *Id.* Further, because North Carolina "has a legitimate interest in governing businesses incorporated, licensed, or doing business within its borders," this court in the *Tools USA* case held that the case would remain in the Middle District of North Carolina. *Id.*  Similarly to the *Tools USA* case, this matter concerns a Defendant company that has done business in North Carolina and merely expressed, as proposition to transfer this matter to another forum, its own corporate inconveniences with the Middle District of North Carolina.

In *Walter Kidde* the Defendant's Motion to Transfer Venue was denied by this Court, which found that transfer was inappropriate where the convenience of the parties and witnesses and interests of justice did not weigh ***strongly*** in favor of the transfer venue. *Walter Kidde,* 304 F. Supp. 2d 769 (emphasis added).  In this case the convenience of the parties and witnesses and interests of justice not only weigh strongly in favor of retaining the matter in North Carolina but there are no factors that weigh in favor of transferring the matter to the Northern District of Illinois. Accordingly, this Court should deny Defendant's Motion to Transfer Venue.

The sole basis for Defendant's assertion that this matter should be transferred to the Northern District of Illinois rests on a forum selection clause contained within the contract at issue, which entire contract is being challenged by the Plaintiff in this declaratory judgment action. At the outset, as noted herein below, Plaintiff states that the forum selection clause should be disregarded inasmuch as it too would fail for consideration or would otherwise be void per the allegations in the Plaintiff's Complaint. However, even if the contract at issue were otherwise not being challenged in its entirety, forum selection

clauses are not conclusively valid and enforceable. *See, e.g., Stewart Organization, Inc. v. Ricoh Corp.,* 487 U.S. 22, 31, 108 S.Ct. 2239, 2245 (1988); *M/S firemen v. Zapata Off-Shore Company,* 407 U.S. 1, 92 S.Ct. 1907 (1986); *Brock v. Entre Computer Centers, Inc.,* 933 F.2d 1253, 1258 (4th Cir. 1991).

Moreover, even if a forum selection clause is valid, it is neither to receive dispositive consideration nor no consideration. *Stewart,* 487 U.S. at 31; *Brock,* 933 F.2d at 1258. The analysis requires a court to first determine if the clause is valid and enforceable and then to balance the convenience factors under section 1404(a) to determine if a transfer is warranted. *Stewart,* 487 U.S. at 31-32; *Brock,* 933 F. 2d at 1258; *Rice v. Bellsouth Advertising and Publishing Corp.,* 240 F. Supp. 2d 526 (2002). For the reasons stated herein below, the forum selection clause, in fact the entire contract at issue is invalid and unenforceable and, in any event, the convenience factors weigh in favor of retention of this matter in the Middle District of North Carolina.

1.    This Action Was Appropriately Brought in North Carolina and the Defendant is Deemed to Reside in North Carolina as it is Subject to Jurisdiction in North Carolina.

From a personal jurisdiction standpoint, there is no dispute from WalTom but that they have availed themselves of the laws and jurisdiction of the State of North Carolina by doing business herein. This Court clearly has jurisdiction over WalTom based upon its extensive contacts with the State of North Carolina both in general and as related specifically to this matter. As such, WalTom is deemed to reside in North Carolina and subject to the jurisdiction of North Carolina.

2.    Enforcement of the Forum Selection Clause Would be Unreasonable and Unjust

A forum selection clause can be shown to be unreasonable and unjust in any of the following four ways: "(1) their formation was induced by fraud or overreaching; (2) the complaining party 'will for all practical purposes be deprived of his day in court' because of the grave inconvenience or unfairness of the selected forum; (3) the fundamental unfairness of the chosen law may deprive the plaintiff of a remedy; or (4) their enforcement would contravene a strongly held public policy of the forum state." *Allen v. Lloyd's of London,* 94 F.3d 923, 928 (4th Cir. 1996) (internal citations omitted). In this case, enforcement of the

forum selection clause would be unreasonable and unjust because it is the result of overreaching on the part of Defendant WalTom; in that Bires would, for all practical purposes, be deprived of his day in court because of the grave inconvenience or unfairness of the forum at issue in the forum selection clause if the matter were transferred to Illinois; and in that the strongly held public policy of North Carolina holds such clauses in disfavor when they call for North Carolina disputes to be heard in a distant forum.  To the extent there is virtually no nexus as between Illinois and this dispute, it would be unconscionable to enforce the forum selection clause Defendants are contending should be enforced.

      (a)      *The Entire Contract is at Issue and Thus any Forum Selection Clause or Choice of Law Provision Contained Therein Should be Disregarded*

At the outset with regard to the forum selection clause in the contract at issue, Plaintiff points out that this Court's determining that that clause or any other clause in the contract at issue is valid would effectively put the cart before the horse in that the Court would necessarily have to find the contract is valid and enforceable to enforce the forum selection clause therein.  Defendant has mischaracterized the dispute as one in which only the royalty provision of the contract at issue is being challenged. Instead, the validity and enforceability of the entire contract is being challenged based on lack or failure of any or adequate consideration, overreaching, unequal bargaining power and unconscionability.  Accordingly, the validity of each of the provisions contained within the contract, including the forum selection clause, would necessarily fail if the entire contract fails for lack or failure of any or adequate consideration, overreaching or unconscionability.

      (b)      *The Contract and thus the Forum Selection Clause Results from Overreaching*

Incredibly the Defendant attempts to assert in its Memorandum that the Forum Selection Clause is not the result of overreaching.  Inasmuch as the entire contract is being challenged based on overreaching and related grounds, clearly the Plaintiff contends that each and every aspect thereof resulted from overreaching, as is more specifically pled in Plaintiff's Complaint. As, more specifically to

the overreaching in the contract as a whole and the forum selection clause in particular, in his Affidavit

Plaintiff Bires states that:

> With regard to the contract that is the subject matter of this dispute, I had already accepted an offer from WalTom for the provision of my services as a driver at the time the document was presented to me.  Only after I had accepted the offer of WalTom to drive for WalTom did WalTom approach me with the contract in dispute and essentially threaten to renege on their obligation if I did not sign it.  If I did not sign it, I would have been without a race car for the 2006 race season, which could have ruined my efforts to continue progressing as a professional race car driver in a highly competitive industry with very few available positions.  I do not recall there being any negotiability regarding the contract term that stipulates all lawsuits must be heard in Illinois.

Bires Affidavit at ¶ 15.  The overwhelmingly overreaching and unconscionable nature of the manner in

which WalTom treated its existing agreement with Bires and forcing him to sign a document that he was

able to provide very little negotiation on, clearly demonstrates that bargaining power of WalTom as

against Bires.  In fact, Bires, who had already accepted the position to drive for WalTom and already

moved to Wisconsin and begun working for WalTom and fulfilling his end of the agreed-to contract with

WalTom had no negotiating power when WalTom threatened to renege on the contracted already reached

with Bires if he did not sign the document at issue.  Bires was forced to sign the entire agreement or else

be faced with no driving position in 2006, as the season had already begun when WalTom presented Bires

with the contract at issue.

In *Dove Air* the Western District of North Carolina found the allegations by the plaintiff that at

the time he signed the agreement he was in desperate financial condition and that defendant insisted both

on the agreement and ultimate control over the venture, together with the provisions of the agreement

itself, showed unequal bargaining power and overreaching. *Dove Air, Inc. v. Bennett*, 226 F. Supp. 2d

771, 775 (W.D.N.C. 2002) (citing *Cox v. Dine-A-Mate, Inc., 129 N.C.App. 773, 776, 501 S.E.2d 353, 355

(1998)*).  The *Dove Air* court stated that "[i]n fact, it appears there was no bargaining at all, but merely the

presentation to [plaintiff Duncan] of the agreement which he had to sign in order to do business with

[defendant] Bennett." Id. (citing *Bell Atlantic Tricon Leasing Corp. v. Johnnie's Garbage Serv., Inc.,* 113 N.C.App. 476, 480-81, 439 S.E.2d 221, 224 (1994) ("There was no bargaining over the terms of the contract between the parties, who were far from equal in bargaining power.")). The *Dove Air* court found that "[c]onsidering all the circumstances surrounding this agreement . . . enforcement of the choice of law and forum selection provisions would be unreasonable and [] compelling reasons have been shown against enforcement." *Id.* (internal citations omitted). So too, would enforcement of the choice of law and forum selection provisions be unreasonable.

The only connection with the venue named in the forum selection clause is that WalTom, which operated the racing shop at which Bires actually worked, solely out of Wisconsin – not Illinois – is purportedly headquartered in Cook County, Illinois. The fact that the only connection between the matters or contract at issue and the selected forum was that the corporate Defendant was headquartered there indicates that the clause was included solely for the convenience of the Defendant. It is unconscionable that WalTom would market its team in North Carolina, would solicit drivers to enter into driver contracts with it in North Carolina and to then hide behind a non-negotiable venue provision in an overreaching and unconscionable contract that is not supported by adequate consideration. Because the entire contract and the specific clause is the product of overreaching by a party with inextricably greater bargaining power and because the entire agreement as well as the clause itself is overtly one-sided and unreasonably favors one party over the other while not having any nexus whatsoever to the forum stated in the forum selection clause, the clause should be found invalid and unenforceable.

(c)      *The Northern District of Illinois is Both Gravely Inconvenient and Unfair*

For many of the reasons discussed in greater detail below, including that, other than the Defendant itself, no other key witness, document or information is exclusively maintained in the State of Illinois; that Defendant cannot legitimately maintain Illinois has a significant connection to the claims in this case or even that Illinois would be a more convenient forum than North Carolina; that it would be a

substantial hardship and would cause undue delay to the administration of this matter if Plaintiff were forced to litigate in Illinois, the Northern District of Illinois is both gravely inconvenient and unfair. By contrast, substantially all of the actions that are or will be the subject matter of this dispute did or will occur in North Carolina.

      *(d)*      *North Carolina Should be Applied and thus the Matter Should be Retained in North Carolina*

"Under North Carolina law, a contract is made in the place where the last act necessary to make it binding occurred." *Tom Togs, Inc. v. Ben Elias Industries Corp.,* 318 N.C. 361, 365, 348 S.E.2d 782, 785 (1986). By Defendant's own admission, the actual and real agreement between the party was offered and accepted after the Hudson, North Carolina test session. Thus, per the Defendant's admission, the contract arose in North Carolina and thus North Carolina law should be applied.

      *(e)*      *The Actual Contract Between the Parties was Entered Into in North Carolina and Thus any Forum Selection Clause for a Forum other than North Carolina that Defendant May Contend is Related Thereto is Void as Against Public Policy*

North Carolina public policy and statutory law opposes the enforcement of forum selection clauses that claim to set venue in distant forms for matters that arise in North Carolina. Defendant admits that the contract was offered and accepted in North Carolina. Mulvenna Decl., Exhibit A to Defendant's Motion to Transfer at ¶ 9; *see also* Def.'s Memo in Support of Motion to Transfer at p. 2. Defendant admits that they came to North Carolina to examine Plaintiff Bires' racing skills and that they offered and that Plaintiff accepted a position to race for WalTom after the Hudson, North Carolina testing session. Accordingly, enforcement of the forum selection clause in this matter would contravene the public policy of North Carolina as stated in Section 22B-3 of the North Carolina General Statutes which unequivocally provides that "any provision in a contract entered into in North Carolina that requires the prosecution of any action or arbitration of any dispute that arises from the contract to be instituted or referred in another state is against public policy and is void and unenforceable.*"* N.C. Gen. Stat. § 22B-3. Thus, the forum selection clause is void and unenforceable.

Even if the court finds the forum selection clause to be valid, a forum selection clause is only one of the factors for the court to consider in a 1404(a) analysis. *See, e.g., Rice* 240 F.Supp.2d 526. Because Illinois has virtually no connection to this suit, nearly all of the 1404(a) factors weigh heavily, if not exclusively, in favor of retaining this case in the Middle District of North Carolina.

    3.    <u>Other Than Two that are Neutral, the Remaining 1404(a) Factors Weigh Almost Exclusively in Favor of Retention</u>

    *(a)*    *Plaintiff's Choice of Forum Favors Retention in North Carolina*

The Plaintiff filed this case in the Superior Court of Rowan County, North Carolina. Clearly the Plaintiff's choice of forum was North Carolina. The allegation by the Defendant that the forum selection clause contained within the contract at issue evidences the Plaintiff's choice of forum is simply without merit. "A plaintiff's choice of a proper forum is a paramount consideration in any determination of a transfer request, and that choice . . . . should not be lightly disturbed," *Rice,* 240 F. Supp. 2d at 530 (internal citations omitted). In *Rice* the Plaintiff filed a lawsuit in State Court in North Carolina. The Defendants then removed to Federal Court and challenged venue based on a forum selection clause. The *Rice* Court denied the defendant's motion to transfer venue in spite of the fact that plaintiff had agreed to a forum selection clause naming Georgia as the forum and held that "[t]he Plaintiffs' filing in North Carolina is a stronger showing of their forum preference than their signature on a form contract signed months earlier. This factor favors retention." *Id.*; *see also, Precept,* 282 F. Supp. 2d 381. In *Rice* the Western District of North Carolina stated that in choosing to file their complaint in North Carolina state court, the plaintiff's "forum preference for North Carolina was clear." *Rice,* 240 F. Supp. 2d at 530. Given the Plaintiff Bires' clear choice of North Carolina as the forum for this dispute, together with North Carolina's public policy against contracts entered into in North Carolina that contain foreign forum selection clauses, this factor clearly weighs in favor of retention.

    *(b)*    *The Residence of the Parties Favors Retention in North Carolina*

The Plaintiff, an individual, resides in North Carolina and the Defendant, as an entity doing business in North Carolina and therefore subject to jurisdiction therein, is also deemed to reside in North Carolina. In fact, while the corporate office and officers of Defendant WalTom purportedly reside in Illinois, WalTom and its officers frequently travel to and do business in North Carolina and avail themselves of the forum of North Carolina including their travels to North Carolina to do business with the Plaintiff which business is at the heart of this dispute. Accordingly, the residence of the parties favors retention. *See, e.g., Rice* 240 F. Supp. 2d at 530 (finding that where the Plaintiffs lived in North Carolina and the Georgia resident Defendants were doing business in North Carolina, the residence of the parties favored retention).

     *(c)     The Relative Ease of Access of Proof Favors Retention in North Carolina*

WalTom states that, other than attorneys, "Tom Gleitsman and John Mulvenna [of WalTom] are the only other persons involved in discussions and negotiations related to the Agreement." Accordingly, those two WalTom officers and Plaintiff Bires may well be the only necessary witnesses to this action which concerns only the validity and enforceability of the contract at issue. *See* Def.'s Memo in Support of Motion to Transfer at p. 3 (citing Mulvenna Decl., Exhibit A to Defendant's Motion to Transfer at ¶ 13). The only issues will be whether there was any or adequate consideration or whether the contract was otherwise unconscionable and/or the subject of overreaching and unequal bargaining power. Those matters can be fully litigated without the need for additional unidentified witnesses. In any event, even if additional WalTom witnesses were needed they would be from Wisconsin and not from Illinois. "because all of WalTom's employees related to this dispute are located in Wisconsin." Bires Affidavit at ¶ 14.

While WalTom asserts generally that its "employees live in Illinois and Wisconsin," it does not state that any of those employees will be witnesses in this matter or even that they are relevant to or

previously worked with Plaintiff Bires some two (2) years ago. A defendant's mere assertion that their witnesses reside in two states other than the state from which they seek to transfer, without any identification as to who their key witnesses are or where precisely they reside, is not sufficient to warrant transfer. *Hardee's Food Systems, Inc. v. Beardmore*, 169 F.R.D. 311, 317 (E.D.N.C. 1996) citing *Aetna Casualty & Sur. Co. v. Singer-General Precision, Inc.,* 323 F.Supp. 1141, 1144 (D.C.Del.1971) (when inconvenience to witnesses is alleged as grounds for transfer, information should be put in the record as to how many witnesses are involved and how far away they are from the transferee court as compared to the transferor court)).

With regard to any corporate documents that WalTom may contend may be related to this matter, the *Hardee's* court cites to *American Standard, Inc. v. Bendix Corp.,* 487 F.Supp. 254, 264 (W.D.Mo.1980) for the proposition that "a party urging location of records and documents as a basis for transfer must show location and difficulty of transporting records." *Id.* To the extent any may be relevant to this dispute, WalTom has not met their burden in showing any difficulty in getting company documents to North Carolina such as to warrant transfer of this matter. Similar to WalTom's assertions as to witnesses and documents that it contends are in either Wisconsin or in Illinois, the *Hardee's* court found that the defendants there had not shown that the factors to be considered in a transfer decision weighed "heavily-or even at all-in their favor." *Id.*

WalTom acknowledges that the entire time Bires drove for WalTom in 2006 he resided in Wisconsin. *See* Def.'s Memo in Support of Motion to Transfer at p. 4 (citing Mulvenna Decl., Exhibit A to Defendant's Motion to Transfer at ¶ 21). Bires states that "[n]othing that has happened between myself and WalTom, either regarding the contract, my driving for WalTom in 2006, or my current engagement in NASCAR, has anything to do or is in any way connected with the State of Illinois." Bires Affidavit at ¶ 9. Further, Bires states in his Affidavit that all of the race operations with which he was involved in 2006

were located in Wisconsin; at all times while Bires raced on behalf of WalTom, the base of the WalTom operation was in Wisconsin; Bires was involved only with the WalTom race shop in Wisconsin, which is where all of WalTom's race cars were stored and worked on; during his tenure with WalTom, Bires was never involved in any operation of a race shop of WalTom's in Illinois; Bires traveled to all of the races in which he competed on behalf of WalTom from the Wisconsin race shop and not from Illinois; Bires lived in Wisconsin throughout the 2006 race season; all of Bires' earnings that were paid to him were paid by WalTom to Bires in Wisconsin, not in Illinois; and the race team that purchased WalTom's race team and its entire operation remains based in Wisconsin, as does Bires' former crew chief for the WalTom race team, Howie Lettow. *Id.* at ¶ 2-6, 9, and 14.

Furthermore, to the extent the Defendant may seek to counterclaim for breach of the contract at issue all documents relevant to any earnings of the Plaintiff or related royalties are maintained exclusively in North Carolina, as would be all witnesses involved in ascertaining any royalties earned by Bires including employees of race teams located in North Carolina as well as any other financial professionals utilized by Bires in North Carolina. *Id.* at ¶ 7, 8 and 10. Bires is currently engaged to compete in NASCAR by JTG Racing in the NASCAR Nationwide Series. Bires Affidavit at ¶ 7. "JTG Racing is based in North Carolina, as is nearly every NASCAR race team in any of the top three NASCAR series (Sprint Cup, Nationwide and Craftsman Truck)". *Id.* at ¶ 8. "Even if the contract is declared valid, everything [Bires] earn[s] as a NASCAR driver will be paid to [him] either by JTG Racing of North Carolina, or by some other NASCAR team which will likely be based in North Carolina." *Id.* at ¶ 10. In fact, according to the official website of The North Carolina Department of Commerce "90% of the NASCAR teams [] have their operations" in North Carolina. Profiles of Industry in North Carolina, http://www.nccommerce.com/en/BusinessServices/LocateYourBusiness/WhyNC/ProfilesOfIndustry/ (last visited February 19, 2008), attached hereto as Exhibit 3. Thus, with regard to any claims as to payments of royalties, WalTom would not be able to compel witnesses to

testify as to any monies earned by Plaintiff if the matter is litigated in Illinois. The issue of the relative ease of access of proof favors retention.

     (c)     *The Availability of Compulsory Process For Attendance of Witnesses and the Costs of Obtaining Attendance of Willing Witnesses Favors Retention in North Carolina*

As described in detail above, WalTom, without identifying any specific witnesses it contends some of its witnesses are located in Illinois and some are in Wisconsin. WalTom admits their main, if not only, two witnesses are their corporate officers. On the other hand, Plaintiff is located in North Carolina, and any witnesses as to what Plaintiff has earned in NASCAR will be in North Carolina and subject to the jurisdiction of the North Carolina Court. These witnesses would not be subject to subpoena power in Illinois and, in any event, the costs of their travel to Illinois would be prohibitive. Thus this factor weighs in favor of retention.

     (e)     *Possibility of a View is Neutral*

There is nothing for a jury to view so this factor is neutral.

     (f)     *Enforceability of a Judgment, if Obtained, Favors Retention*

If any judgment is obtained in favor of the Plaintiff declaring that the contract is void and of no effect, then certainly full faith and credit would afford the same validity to that judgment in Illinois or any other jurisdiction in which WalTom might reside. On the other hand, assuming the Defendant asserts a counterclaim for breach of contract against the Plaintiff, a North Carolina judgment will be more easily enforced against Plaintiff as a North Carolina resident and would not need to be subsequently domesticated in North Carolina. Accordingly, this factor favors retention.

     (g)     *The Relative Advantages and Obstacles to a Fair Trial Favors Retention*

So-called home field advantage favors retention because WalTom, a race team practicing and otherwise doing business in North Carolina, was at all times relevant, just as much at home in North Carolina as Plaintiff, originally a citizen and resident of Wisconsin now residing and working in North

Carolina. Moreover, many of the facts and matters at issue in this litigation have already or will in the future occur in North Carolina. WalTom even acknowledges that "has no doubt that it would receive a fair trial in [the Middle District of North Carolina]." On the contrary, the only tie to Illinois is that WalTom apparently resides there. This fact is not only insufficient to warrant transfer, rather, it would inappropriately swing the balance of unfairness in favor of WalTom if the matter were transferred to Illinois, since Plaintiff Bires has absolutely no tie to Illinois. It is much more likely, on the contrary to WalTom's assertions that Plaintiff Bires may have an advantage in North Carolina, that WalTom would gain a great advantage by having this matter litigated in the Northern District of Illinois which it claims as its principal place of business, which is presumably why WalTom wanted an Illinois forum even though no actions giving rise to this matter occurred in Illinois. This factor favors retention in North Carolina where there would be no obstacles to either party with regard to fair trial.

> (h)    *Other Practical Problems That Make a Trial Easy, Expeditious and Inexpensive all Favor Retention*

The interests of justice would be best served by retaining this case in North Carolina as, *inter alia* and for the reasons stated more particularly herein, the Plaintiff would suffer a severe hardship should the matter be transferred to any other jurisdiction and the proceedings in this matter would be significantly delayed as a result thereof as well. Given the difficulties and hardship on Plaintiff of resolving this dispute in Illinois, including that Plaintiff has a rigorous work traveling schedule which will have him traveling all over the United States and to Mexico and Canada for over 35 race weekends this year and that, if this case is transferred it would merely be a hardship on and shift the inconveniences to Plaintiff, this factor also favors retention. In his Affidavit Bires states:

> As a NASCAR driver, my schedule is hectic. I am scheduled to compete in 35 races in the Nationwide Series in 2008, which will be held throughout the United States, Canada and Mexico. I am typically in the Charlotte, North Carolina area from Sunday through Wednesday, addressing my various off-track obligations to my team and its sponsors, after which I am traveling to compete in that weekend's race. I will best be able to participate in this matter in an effective fashion if it stays in North Carolina.

17

Bires Affidavit, Exhibit 2 at ¶ 11 and *see* ¶ 13. Thus the interests of justice and administration of this case mandate that it be retained in North Carolina.

       (i)      *The Administrative Difficulties of Court Congestion is Neutral*

While Defendant cites to the length of case disposition for the Middle District of North Carolina during the twelve month time period ending March 31, 2007 it is, of course, worthy of note that during that time the Middle District of North Carolina had judicial appointments pending that have now been confirmed. Further, the Middle District of North Carolina, according to Defendant's exhibit, has less cases and the median time interval for the Middle District of North Carolina, compared to that of the Northern District of Illinois, is not of such sufficiency as to warrant transfer. Accordingly, this factor is neutral.

       (j)      *The Interest in Having Localized Controversies Settled at Home and the Appropriateness in Having the Trial of a Diversity Case in a Forum that is the Home with the State Law that Must Govern the Action Favors Retention*

North Carolina has an interest in having this local controversy settled within North Carolina. This controversy involves a racing relationship that resulted from driver testing in North Carolina, was formed in North Carolina and, if any royalties are deemed by this Court to be owed will be owed due to Bires' racing efforts in North Carolina. All actions that will give rise to duty to pay royalties will necessarily occur in North Carolina, as 90% of the NASCAR teams for which Bires might drive are located in North Carolina. *See, e.g.*, Bires Affidavit at ¶ 12 ("All actions which involve this lawsuit, and WalTom's alleged right to my future earnings, are taking place and will take place in the future in North Carolina. WalTom and its principles understand racing – it was always their intent that I would earn my living in North Carolina as a NASCAR driver." ¶ 12). "North Carolina has a substantial interest in the execution of contracts within this state . . . [and] solicitation of business within the state." *Superguide Corp. v. Kegan,* 987 F.Supp. 481, 486-87 (W.D.N.C.1997).

If WalTom is willing to concede that it is not interested in any earnings of the Plaintiff's generated from any activities of the Plaintiff in or related to the State of North Carolina, then perhaps we have nothing to litigate. Until such concession, we do. As to Illinois, other than the Defendant's residence and the location of its officers and one of its attorneys in Illinois, there is no relationship between this matter and the state of Illinois. Accordingly, there is a strong interest in having this matter resolved in North Carolina and that factor favors retention.

(k)     *The Avoidance of Unnecessary Problems with Conflict of Laws Favors Retention*

Inasmuch as substantially all of the actions that have or may in the future give rise to this controversy or to any duty by the Plaintiff to provide any future royalties have or will occur in or are substantially related to North Carolina, this dispute has the greatest impact on citizens of North Carolina. There is, therefore, a strong interest in having it resolved in North Carolina. *See, e.g.*, *Rice* 240 F. Supp. 2d at 531. Furthermore "North Carolina has expressed its preference in having its controversies settled at home by enacting legislation voiding forum selection clauses." *Id.* (citing N.C. Gen. Stat. § 22B-3 and stating that "[t]his public policy weighs heavily in favor of retaining the suit in North Carolina"). While there is a choice of law provision in the contract in dispute, for the reasons stated herein above, that choice of law provision should be disregarded in that the actual contract between the parties was entered into in North Carolina and the contract containing the choice of law provisions is unconscionable, lacks or fails for adequate or any consideration, was the product of overreaching and unequal bargaining power and should otherwise be deemed void and unenforceable. Furthermore, even if the Court determines that Illinois law applies, it can be as easily applied in North Carolina. The interest in having this North Carolina controversy settled in North Carolina thus favors retention.

## CONCLUSION

Nine of the eleven factors favor retention, two are neutral and none favor transfer. While the Defendant contends the court should rely heavily on the forum selection clause in the disputed contract at issue, that provision results from overreaching, is unfair, is void as against North Carolina public policy and would not otherwise be accorded any dispositive weight even if it were valid. Other than that WalTom wishes to be sued in Illinois, there is simply no reason to transfer this matter to the Northern District of Illinois. Rather, because a transfer would gravely inconvenience the parties, the witnesses and the courts, enforcement of the forum selection clause would be unreasonable. Lastly, considering all the factors this matter should be resolved in North Carolina as North Carolina has far greater connections to this suit. Accordingly, the Defendant's Motion to Transfer should be denied.

This 19th day of February, 2008.

/s/ Shannon L. Vandiver
William P. Bray
N.C. State Bar No. 20494
Shannon L. Vandiver
N.C. State Bar No. 29484
The Bray Law Firm, PLLC
4701 Hedgemore Drive, Suite 816
Charlotte, North Carolina 28209
Telephone: 704.523.7777
Facsimile: 704.523.7780
svandiver@braylaw.com; wbray@braylaw.com
ATTORNEYS FOR PLAINTIFF

**CERTIFICATE OF SERVICE**

I hereby certify that on February 19, 2008, I electronically filed the foregoing MEMORANDUM

OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO TRANSFER VENUE with the Clerk of

Court using the CM/ECF System which will automatically send email notification of such filing to the

following attorneys of record:

      Christopher C. Lam
      John H. Culver III
      Kennedy Covington Lobdell & Hickman, LLP
      214 North Tryon Street, 47th Floor
      Charlotte, NC 28202
      clam@kennedycovington.com


This the 19th day of February, 2008


            /s/ Shannon L. Vandiver
            Shannon L. Vandiver

STATE OF NORTH CAROLINA

COUNTY OF ROWAN

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
07-CVS- 3615

KELLY BIRES,                          )
                                      )
                Plaintiff,            )
                                      )
v.                                    )
                                      )
WALTOM, LLC d/b/a WALTOM RACING )
LLC,                                  )
                                      )
                Defendant.            )
                                      )
                                      )
_____ )

**VERIFIED
COMPLAINT
(Jury Trial Demanded)**

NOW COMES THE PLAINTIFF, complaining of the Defendant and alleges as follows:

1.      Plaintiff Kelly Bires (hereinafter referred to as "Plaintiff," "Bires" or "Plaintiff Bires") is a citizen and resident of Kannapolis, Rowan County, North Carolina.

2.      Upon information and belief, Defendant WalTom, LLC d/b/a WalTom Racing, LLC ("WalTom" or "Defendant") is a limited liability company organized and existing under the laws of the State of Illinois with primary places of business in Sussex, Wisconsin and Burr Ridge, Illinois.

3.      At all times relevant, the Defendant was and is engaged in substantial activity within North Carolina purposefully availing itself of the privilege of conducting business within North Carolina both generally from its continuous and systematic activities within North Carolina and specifically, with regard to the facts and circumstances at issue herein, including but not limited to by, as discussed in detail below, conducting testing and other business in North Carolina with or concerning Plaintiff.

1

4.    Accordingly, venue and jurisdiction are proper in the Superior Courts of North Carolina.

5.    Plaintiff is a professional race car driver by trade, and currently competes in various series of the National Association for Stock Car Auto Racing, which association is more commonly referred to and will hereinafter be referred to as "NASCAR."

6.    In 2005, Plaintiff, at his own cost and expense, competed in various races at different venues.

7.    In the hopes of driving a full race season schedule in the ASA Late Model Series in 2006, in October of 2005 Plaintiff, then twenty-two (22) years old, applied for a position with the Defendant's ASA Late Model team in the ASA Late Model Challenge Series.

8.    Shortly after October 2005, Defendant contacted Plaintiff and invited Plaintiff to participate in a series of driving tests to be held over a period of three (3) days at a test race track in Hudson, North Carolina.

9.    At least nine (9) other prospective drivers competed in these tests conducted by the Defendant in Hudson, North Carolina, the purpose of which was, upon information and belief, to allow Defendant to examine driving related skills of the prospective drivers, all of whom were competing for an opportunity to race with, for or on behalf of the Defendant in 2006.

10.    After Plaintiff's successful driving performance in Hudson, North Carolina, Defendant contacted Plaintiff and demanded that he participate in additional testing in Pensacola, Florida, in order to have an opportunity to race for the Defendant in 2006.

11.    After the Pensacola, Florida testing, Defendant offered Plaintiff a position as the driver of Defendant's #89 ASA Late Model racecar (hereinafter referred to as the "#89 Team") for the 2006 season in the ASA Late Model Challenge Series.

12.    The Plaintiff accepted Defendant's offer to race for Defendant as the driver of Defendant's #89 Team and moved to Sussex, Wisconsin, the location of Defendant's race shop, to do so.

13.    In Sussex, Wisconsin Plaintiff began working with the #89 Team, helping build race cars for the 2006 ASA Late Model Challenge Series season and otherwise assisting in the preparation for the 2006 season.

14.    Prior to moving to Sussex, Wisconsin and prior to or at the time of Plaintiff's initiation of employment with Defendant, Defendant had not presented Plaintiff with any written agreements regarding terms other than those as offered and previously accepted by Plaintiff, to wit, a position as the driver of the #89 Team in 2006.

15.    At some point after Plaintiff had accepted Defendant's offer, after he had moved to Sussex, Wisconsin and after he began working for, with or on behalf of Defendant, Defendant submitted to Plaintiff a proposed written contract containing additional terms and conditions.

16.    Due to, *inter alia*, the onerous language of the proposed written contract submitted by the Defendant, Plaintiff initially refused outright to sign the proposed written contract.

17.    After some discussions between Plaintiff and Defendant regarding the Defendant's proposed contract, Defendant made minor alterations to the written document but otherwise refused to make any further changes.

18.    By the end of January 2006 the Plaintiff still refused to execute the proposed written contract due to the continued presence of onerous and one-sided language.

19.    Defendant then made various threats to Plaintiff concerning Plaintiff's racing for Defendant in the 2006 season and specifically told Plaintiff that it had "ten other drivers that

3

wouldn't hesitate to take his place," and that the Plaintiff had to sign the proposed written contract or the Defendant would find another driver to take the place of the Plaintiff.

20.    In or around February of 2006 the Plaintiff signed the document that is attached hereto as Exhibit A.

21.    Exhibit A is a true and accurate copy of the document signed by Plaintiff.

22.    The term of Exhibit A was to begin on or about January of 2006 and continue until its expiration at the conclusion of the 2006 ASA season.

23.    Section 5 of Exhibit A (hereinafter referred to as the "Royalties Provision") contains terms for payments to be made by Plaintiff to Defendant on monies earned by Plaintiff after the expiration of Exhibit A.

24.    The Royalties Provisions purportedly requires Plaintiff to make payments to Defendant in the amount of twenty-five percent (25%) of all gross income, as defined in the Royalties Provision, for a period of ten (10) years following Plaintiff's cessation of any and all driving or other duties for Defendant.

25.    Depending on the nature of the Plaintiff's career, the ten (10) year period referenced in the Royalties Provision may be extended indefinitely.

26.    Payments under the Royalties Provision are to be derived from future money earned by the Plaintiff not only as a professionsal race car driver but also monies related to "managed investments, entertainment, amusement, music, recording, songwriting, publishing, internet publishing, television, motion picture, nightclub, concert, radio and theatrical industries . . . as a speaker, a live performer, recording artist, musician, singer, songwriter, publisher, so-called 'sideman,' packager, owner of entertainment packages, producer actor and [] also include[s] the use of the Driver's name, voice, likeness, etc." Exhibit A at ¶ 5.

4

27. Section 5 of Exhibit A further states:

> It is the intent of the parties that WalTom be compensated out of Driver's
> Future Race-Related Earnings for a total of ten (10) years of Professional
> Race Car Driving ("PRCD"). PRCD is defined as full-time professional
> racing at the NASCAR Craftsman Truck, NASCAR Busch or NASCAR
> Nextel Cup levels or other driver compensation [sic] equivalent
> professional racing association.

Exhibit A at ¶ 5.

28. During the 2006 ASA Late Model Challenge Series season, while competing on behalf of the Defendant and the #89 team, Plaintiff won six (6) races and was named the 2006 Challenge Series Rookie of the Year and Challenge Series Champion.

29. The 2006 racing season was the only season that the Plaintiff competed for the Defendant or the #89 Team.

30. At the conclusion of the 2006 season, Plaintiff and Defendant's agreement for Plaintiff to drive for Defendant in 2006 expired, as would have the written purported contract at Exhibit A, and Defendant made no further offers to Plaintiff for Plaintiff to race for, with or on behalf of Defendant in 2007.

31. In or around October of 2006, Plaintiff was contacted by Wood Brothers/JTG Racing (hereinafter referred to as "WoodBros/JTG"), a race team competing in various divisions of NASCAR, to drive for, with and on its behalf in the NASCAR Craftsman Truck Series during the 2007 racing season.

32. Defendant did not assist, advise or otherwise take any efforts related in any way to securing the Plaintiff's opportunity with WoodBros/JTG.

33.    Plaintiff accepted the offer of WoodBros/JTG and, accordingly, competed in the NASCAR Craftsman Truck Series and the NASCAR Busch Series for Wood Bros/JTG during 2007.

34.    Upon information and belief, Defendant has sold substantially all of the assets of its ASA Late Model teams, including the #89 Team.

## FIRST CLAIM FOR RELIEF
### (Declaratory Judgment)

35.    All previous allegations are incorporated by reference as if fully contained herein.

36.    Plaintiff is an interested person within the meaning of the North Carolina Declaratory Judgments Act, N.C. Gen. Stat. § 1-253, *et seq.*, with respect to Exhibit A.

37.    Exhibit A is void, invalid and unenforceable as it, *inter alia*, is unconscionable, fails for a lack of consideration or that the consideration is grossly inadequate and in that there was no meeting of the minds, the parties did not agree as to the essential terms of Exhibit A and Exhibit A is otherwise too vague or uncertain in many of its terms to be enforceable.

38.    Additionally, Exhibit A was effectively nonnegotiable inasmuch as the Defendant did not allow Plaintiff any substantial ability to negotiate the terms of Exhibit A and told Plaintiff that he had to sign Exhibit A in a form substantially similar to that initially proposed in order for Plaintiff to drive for Defendant, a right Plaintiff already had under the terms of Plaintiff and Defenant's existing agreement.

39.    The Defendant had superior bargaining power when compared to Plaintiff based on the economic circumstances and realities including but not limited to that Plaintiff had already been offered and accepted the position to race for Defendant, Plaintiff could not afford to finance his own racing team for the 2006 ASA season nor was he able to achieve similar services from

6

other third parties, Plaintiff was told that he had to sign Exhibit A and race with the Defendant or face the possibility that he might not get the chance to race professionally in 2006.

40.     No honest and fair person under similar circumstances would have proposed the terms of Exhibit A, including but not limited to the Royalty Provision thereof and no reasonable person of relatively equal bargaining power would have accepted the same.

41.     Exhibit A is, *inter alia*, unconscionable and should be rendered void and unenforceable.

42.     Prior to the filing of this action, Defendant has repeatedly through various correspondence and other actions taken the affirmative position that Exhibit A is valid and enforceable and that Defendant, thus, expects Plaintiff to render accountings and payments to Defendant thereunder.

43.     Accordingly, a real and justiciable controversy currently exists between the parties arising out of the parties opposing contentions as to the validity and enforceability of Exhibit A and the parties legal rights and liabilities related thereto.

44.     Plaintiff seeks, pursuant to N.C. Gen. Stat. § 1-253, *et seq.*, that this Court declare the rights, status and other legal relations concerning or related to the validity or invalidity, enforceability or unenforceability of Exhibit A and the parties' related rights and/or obligations.

45.     Plaintiff specifically requests that this Court declare that the purported contract is null, void, invalid and unenforceable and that, therefore, Plaintiff has not duties or obligations thereunder.

**WHEREFORE**, Plaintiff respectfully requests the following relief from this Court:

(a)     That judgment be entered for Plaintiff and against Defendant and that Exhibit A be declared null, void, invalid and unenforceable and that the Court declare that Plaintiff is in no way bound by any terms of Exhibit A;

(b)    For a trial by jury on all issues raised herein;

(c)    That all of the costs incurred by Plaintiff in prosecuting this action be taxed to the Defendant including reasonable attorneys' fees; and

(d)    That Plaintiff be awarded such other and further relief as the court deems just and proper.

Respectfully submitted, this the 21st day of November, 2007.

THE BRAY LAW FIRM, PLLC

William Bray
North Carolina Bar No. 20494
4701 Hedgemore Drive, Suite 816
Charlotte, North Carolina  28209
Phone: 704-523-7777
Fax: 704-523-7780
*Attorney for Plaintiff*

STATE OF NORTH CAROLINA

COUNTY OF ROWAN

VERIFICATION

Kelly Bires, being first duly sworn, deposes and states that he is the Plaintiff, and knows the contents of the foregoing Complaint; that the same are true to his own knowledge, except as to the matters and things therein stated on information and belief, and as to those matters, he believes them to be true.

_____
Kelly Bires

Mecklenburg County, North Carolina

Sworn to and subscribed before me
this day by Kelly Bires.

Date: November 20, 2007

_Stacy D. Allison_
Notary Public
My Commission Expires: May 10, 2012

[SEAL]



Exhibit
A

## Professional Driving and Sponsorship Agreement

This Professional Driving and Sponsorship Agreement ("Agreement") is made and entered into by and between Kelly Bires ("Driver") and WalTom Racing, LLC ("WalTom"), effective this 1st day of January, 2006.

WHEREAS, Driver desires to receive instruction, mentoring, and financial support from WalTom in the development and enhancement of his professional career in the racing industry;

WHEREAS, the nature and extent of Driver's success or failure as a professional driver cannot be pre-determined;

WHEREAS, WalTom is willing to accept the risk of failure and likewise benefit to the extent of Driver's long-term success;

WHEREAS, this Agreement is entered in the spirit of continued friendship, cooperation, and long-term mutual enrichment;

NOW, THEREFORE, for and in consideration of the mutual promises contained herein, and for other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, Driver and WalTom agree as follows:

1. <u>Driver Salary:</u>  WalTom agrees to pay Driver or his designee the sum of <u>$2,800</u> every month while Driver is driving for WalTom on WalTom's ASA Late Model ("ASA") team in the ASA Late Model Challenge Series events, plus selected ASA Late Model North or South Series events, and/or other selected events.  From event purse monies received, WalTom also agrees to pay Driver incentives equal to twenty percent (20%) for Driver's finishing positions of 10th or better and an additional $500 bonus for each race Driver wins.  Driver shall not receive a percentage of year-end point fund monies or other year-end bonuses if any, except that Driver shall receive an additional $1,000 bonus if Driver wins the ASA Late Model Challenge Series points championship.

2. <u>Expenses to be paid by WalTom:</u>  WalTom at its sole discretion and subject to termination at-will by WalTom at any time will continue to pay the expenses associated with running a competitive ASA racing team for Driver including but not limited to: the Driver Salary paid to Driver described in paragraph 1 above, pit equipment, race haulers, tools, cars, travel expenses, professional fees, personnel expenses, uniforms, rent, utilities and other costs and expenses associated therewith.

3. <u>Term:</u>  The term of this Agreement shall commence January 1, 2006 and shall run through the last scheduled ASA race in 2006.  WalTom shall have the option to renew this Agreement for the 2007 ASA racing season or any part thereof.

4. <u>Driving and Related Duties:</u>

A. <u>Physical Condition and Conduct:</u>  Driver agrees to serve WalTom and its race team diligently and faithfully, to keep in first class physical condition, and to observe and comply with all the team's rules and regulations.  Driver agrees to conform to high standards of personal conduct (before, during and after working hours), fair play and good sportsmanship.  Driver agrees to stay drug free and agrees to submit to random drug testing by WalTom or ASA.  Driver also agrees to submit to physical or psychological examination at the expense of WalTom.   Driver has no physical or mental defects which would prevent or impair the performance of Driver's skilled

1

Driver KB   WalTom TH

services as a professional driver for WalTom. Driver is capable of and will perform race car driving and such other duties as may be required under this Agreement with expertise, diligence and fidelity.

B. Promotion: Driver agrees to cooperate with WalTom and to participate in any and all promotional activities of WalTom which, in the sole opinion of WalTom, will promote the race team, ASA, or professional racing.

5.    Royalties: In exchange for the Driver Salary payments made to Driver or his designee, the substantial costs and expenses advanced by WalTom for the benefit of Driver, for the advice, counsel, training and mentoring, and other valuable consideration, Driver agrees to make future payments to WalTom as follows:

For a period of ten (10) years after Driver ceases driving for WalTom Driver shall pay royalties to WalTom in the amount of twenty-five percent (25%) of all Future Race-Related Earnings defined as follows: Future Race-Related Earnings are any and all gross monies or other consideration earned or received at any time by or on behalf of Driver as a result of Driver's activities in and throughout the Racing Industries. As used herein, Racing Industries shall include without limitation all aspects of racing, driving, appearances, sponsorships, endorsements, managed investments, entertainment, amusement, music, recording, songwriting, publishing, internet publishing, television, motion picture, nightclub, concert, radio and theatrical industries, and shall also include any and all forms of advertising, merchandising, or other exploitations using Driver's name, photograph, voice, sound effects, likeness, caricatures, talents or materials. The term "activities" shall mean Driver's activities in any capacity whatsoever in the racing and entertainment industries, whether as speaker, a live performer, recording artist, musician, singer, songwriter, publisher, so-called "sideman," packager, owner of entertainment packages, producer, actor and shall also include the use of Driver's name, voice, likeness, etc. as aforesaid. Notwithstanding the foregoing for each year for which Royalties are due to WalTom the first $100,000 of Driver's Future Race-Related Earnings are exempt from Royalties.

It is the intent of the parties that WalTom be compensated out of Driver's Future Race-Related Earnings for a total of ten (10) years of Professional Race Car Driving ("PRCD"). PRCD is defined as full-time professional racing at the NASCAR Craftsman Truck, NASCAR Busch or NASCAR Nextel Cup levels or other driver compensation equivalent professional racing association. In the event that Driver does not race at the PRCD level for ten (10) consecutive years after driving for WalTom, then the ten (10) year period shall be extended until Driver's Future Race-Related Earnings exceeds $200,000 annually for a total of ten (10) years. See Exhibit A attached hereto for a sample calculation.

Gross Monies or Other Consideration: The term "gross monies or other consideration" shall include salaries, earnings, payments, fees, royalties, advances against future earnings, residuals, repeat and/or re-run fees, bonuses, shares of profit, shares of stock, partnership interests and any and all sums resulting from Driver's activities and uses of the results and proceeds thereof, payments for termination of Driver's activities, payments to refrain from any such activities and payments in connection with the settlement or other disposition of any dispute concerning said activities, which are earned or received directly or indirectly by Driver or Driver's heirs, executors, administrators or assigns or by any other person, firm or corporation on my behalf. Driver also agrees that all gross monies or other consideration directly or indirectly earned or received by any corporation, partnership, trust, joint venture, association, proprietorship or other business entity in which driver has any direct or indirect interest or control shall be subject to royalties to WalTom.

Driver _KB_    WalTom _TA._

6. __Termination:__ WalTom shall have the right to terminate this Agreement at any time, with or without cause. Driver may terminate his duties and obligations as ASA driver for the WalTom race team by 60-day prior written Notice as set forth in paragraph 10 below. Driver's obligations for Royalties under paragraph 5 above shall survive the termination of his driving responsibilities for WalTom.

7. __Manner of Payments:__ The Royalty payments shall be made on a quarterly basis. Each payment shall be accompanied by a reasonably detailed accounting statement indicating the amount and source of each item of gross income. Upon at least ten (10) days written notice, WalTom may inspect, audit and copy the books and records of Driver or any entity in which he has an interest or over which he has control which relate to monies received for Driver's activities which are subject hereto. Such audit will be conducted at the expense of WalTom at the location where such books and records are maintained. If WalTom's audit shows a discrepancy in Royalties due to WalTom, then Driver shall remit such amount due to WalTom within ten (10) days from request. Additionally, if the discrepancy in gross income or Royalties due to WalTom exceeds 5% of the amount indicated on the detailed accounting statement presented to WalTom, then Driver shall reimburse WalTom for the reasonable costs of said audit including accounting and/or legal fees within ten (10) days from request.

8. __Independent Contractor:__ Driver is an independent contractor and not an employee of WalTom. Driver and WalTom agree to be solely and independently responsible for the payment of all federal, state and local taxes, if any, on any monies paid or distributed pursuant to this Agreement.

9. __Notice:__ All Notices which either party shall be required or desire to give to the other hereunder shall be in writing and shall be served by personal delivery, or United States certified or registered mail, return receipt requested, addressed to the intended recipient at the following address or such other address as either party may designate by notice.

|  |  |  |
|---|---|---|
| To Driver: | (Address: | Kelly Bires |
|  |  | 4821 Easy Street #5 |
|  |  | Hartland, WI 53029 |

To WalTom Racing:    Mr. John Mulvenna
Texor Petroleum
3340 S. Harlem Avenue
Riverside, IL 60546

With cc to:    Mr. Faustin Pipal
Pipal & Berg, LLP
150 S. Wacker Drive
Suite 2650
Chicago, IL 60606

10. __Illinois Law Applies:__ This Agreement shall be deemed to be executed in the State of Illinois and shall be construed in accordance with the laws of said State, and any action to enforce or interpret the terms hereof shall be brought exclusively in the courts of Cook County, IL. In the event any provision hereof shall for any reason be found invalid, illegal or unenforceable, then, and in any such event, the same shall not affect the validity of the remaining portion and provisions hereof.

3

Driver KB WalTom JM

11. Entire Agreement: This Agreement is the entire agreement of the parties and supersedes any other or collateral agreement (oral or written) between the parties in any manner relating to the subject matter hereof. This Agreement may only be modified, altered or amended by an instrument in writing signed by the party sought to be charged.

12. Attorney's Fees: In the event of any dispute under or relating to the terms of this Agreement or the performance, breach, validity, construction, interpretation, execution or legality thereof, the prevailing party shall be entitled to recover any and all reasonable attorney's fees and other costs incurred with respect to such dispute.

13. Pictures of Driver: Driver agrees, beginning with the effective date hereof that current or future photographs, whether still or action, and motion pictures may be taken and any form of broadcasts or telecasts of Driver, individually or with others, may be made at such times or places as WalTom may designate and agrees that all rights therein and all right to Driver's name, voice, signature, biographical information and likeness shall belong to WalTom and that they may be used, reproduced, sold, licensed, or otherwise disseminated or published by WalTom or its licensees, assignees and/or other designees directly or indirectly in any medium whatsoever for any purpose (including but not limited to in broadcast, in print, on trading cards, posters and other merchandise of any kind, in electronics, in audio, in video or in connection with any media), in any manner and at any time, including after the term of this Agreement, that WalTom desires. Driver acknowledges that the foregoing rights include, without limitation, all related copyright, trademark, trade name, service mark, right of publicity and/or right of privacy rights. WalTom acknowledges that it shall not have any of the foregoing property rights in photographs or motion pictures taken or made after Driver is no longer driving for WalTom, except for royalty rights as described in paragraph 5 above.

14. Injunctive Relief: Driver has exceptional and unique skill and ability as a race car driver, and Driver's services to be rendered to WalTom are of a special and extraordinary character which gives Driver a peculiar value which cannot be reasonably or adequately compensated for by damages at law. Therefore, Driver agrees that, in addition to other remedies, WalTom shall be entitled to injunctive and other equitable relief to prevent a breach of this Agreement by Driver, including without limitation the right to enjoin Driver from driving for another ASA team or organization during the term of this Agreement.

15. Driving for Others/Other Risky or Dangerous Sports: Driver agrees that during the term hereof Driver will not drive for any other race team without the written consent of WalTom. Driver and WalTom recognize that Driver's participation in certain sports or activities may jeopardize his health and well-being. Accordingly, Driver agrees not to engage in motorcycle racing, hang gliding, wrestling, karate, tae kwon do, judo, football, skiing, hockey or any other sport or activity involving a substantial risk of personal injury.

16. Assignment: Driver agrees and understands that this Agreement may be assigned by WalTom, but not by Driver. Driver also agrees that his obligation for Royalties shall survive his death to the extent that his estate includes Future Racing-Related Earnings.

17. Attorney Review: Driver acknowledges that he has been afforded the opportunity to seek, and in fact has sought, the advice of counsel in connection with this Agreement. Driver's counsel has had input into the composition of this Agreement. Driver and WalTom agree that there shall be no legal presumption imposed against either party for drafting this Agreement.

18. Release of Liability for Personal Injury: Driver hereby releases, discharges, and covenants not to sue WalTom, its owners, employees, agents and assigns from all liability to Driver, his heirs, next

Driver KB  WalTom TB

4

of kin, and assigns for any and all loss or damage, and claims or demands thereof, on account of injury to the person or property or resulting death of Driver while Driver is engaged in the activities of operating a race car at a race event, practice or test.

Accepted and agreed to:

_~Kelly Bires~_        _2/7/06_
Driver: Kelly Bires           Date

Accepted and agreed to:

WalTom LLC
By: _Thomas E. Gleitsman_

_Thomas E. Gleitsman_
(Print Name)

Its: _MANAGING MEMBER_      _2/9/06_
(Title)                             Date

Driver _KB_ WalTom _TG_

5

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| KELLY BIRES,<br><br>*Plaintiff*<br><br>v.<br><br>WALTOM, LLC D/B/A WALTOM RACING, LLC<br><br>*Defendant* | )<br>)<br>)<br>)<br>) CASE NO. 1:07-CV-00959-JAB-WWD<br>)<br>)<br>)<br>)<br>)<br>) |

## AFFIDAVIT OF KELLY BIRES

NOW COMES Kelly Bires, plaintiff in the above-captioned matter, after being first duly sworn, deposes and says as follows:

1.      I am the plaintiff in this matter, which is captioned as Kelly Bires vs. WalTom, LLC d/b/a WalTom Racing, LLC.

2.      Although WalTom, LLC is apparently an Illinois company, all of the race operations with which I was involved were located in Wisconsin.

3.      At all times while I raced on behalf of WalTom, our base of operations was in Wisconsin.  WalTom owned a race shop in Wisconsin, which is where we stored all of WalTom's race cars and worked on them between races.  We never operated from a race shop in Illinois and traveled to all of the races in which we competed from the Wisconsin race shop.

4.      I lived in Wisconsin throughout the 2006 race season, working at WalTom's race shop which I described in the previous paragraph of this affidavit.

5.      All of my earnings, which were paid by WalTom, were paid to me in Wisconsin, not Illinois, during the 2006 race season.

6.      The race team which purchased WalTom's race team and its entire operation remains based in Wisconsin, as does my former crew chief for the WalTom race team, Howie Lettow.

7.      WalTom contends that the contract that is the subject matter of this lawsuit entitles it to a percentage of my earnings as a NASCAR driver.  I am currently engaged to compete in NASCAR by JTG Racing in the NASCAR Nationwide Series.  JTG Racing is based in North Carolina, as is nearly every NASCAR race team in any of the top three NASCAR series (Sprint Cup, Nationwide and Craftsman Truck).

8.      It was always anticipated by WalTom that I would ultimately drive in NASCAR, and find work as a driver with a team in North Carolina.  In fact, the contract that is currently in dispute specifically references NASCAR competition.

9.      Nothing that has happened between myself and WalTom, either regarding the contract, my driving for WalTom in 2006, or my current engagement in NASCAR, has anything to do or is in any way connected with the State of Illinois.

10.     Even if the contract is declared valid, everything I earn as a NASCAR driver will be paid to me either by JTG Racing of North Carolina, or by some other NASCAR team which will likely be based in North Carolina.

11.     As a NASCAR driver, my schedule is hectic.  I am scheduled to compete in 35 races in the Nationwide Series in 2008, which will be held throughout the United States, Canada and Mexico.  I am typically in the Charlotte, North Carolina area from Sunday through Wednesday, addressing my various off-track obligations to my team and its sponsors, after which I am traveling to compete in that weekend's race.  I will best be able to participate in this matter in an effective fashion if it stays in North Carolina.

12.     All actions which involve this lawsuit, and WalTom's alleged right to my future earnings, are taking place and will take place in the future in North Carolina.  WalTom and its principles understand racing – it was always their intent that I would earn my living in North Carolina as a NASCAR driver.

13.     WalTom stated in its earlier affidavit that Tom Gleitsman and John Mulvenna would be its only two, primary witnesses.  I may be the only witness necessary for my case, meaning that the hardships would only be on me, and the hardship would be more serious, due to the travel schedule required as a NASCAR driver.

14.     Even if WalTom needs additional witnesses for its case, those witnesses would located in Wisconsin, not Illinois, because all of WalTom's employees related to this dispute are located in Wisconsin.

15.     I will suffer a significant hardship if this matter is transferred to a different, jurisdiction, and the proceedings in this matter may be significantly delayed due to my travel schedule.

16.     With regard to the contract that is the subject matter of this dispute, I had already accepted an offer from WalTom for the provision of my services as a driver at the time the document was presented to me.  Only after I had accepted the offer of WalTom to drive for WalTom did WalTom approach me with the contract in dispute and essentially threaten to renege on their obligation if I did not sign it.  If I did not sign it, I would have been without a race car for the 2006 race season, which could have ruined my efforts to continue progressing as a professional race car driver in a highly competitive industry with very few available positions.  I do not recall there being any negotiability regarding the contract term that stipulates all lawsuits must be heard in Illinois.

SO SAYETH THE AFFIANT.

This the _19th_ day of February, 2008.

_____
Kelly Bires
*Plaintiff*

Mecklenburg County, North Carolina

Sworn to and subscribed before me
this day by Kelly Bires

Date: _Feb 19_ , 2008

_____
Carrie W Hatfield, Notary Public
My Commission Expires: _8/9/10_



[SEAL]
CARRIE W. HATFIELD
NOTARY
PUBLIC
MECKLENBURG COUNTY, N.C.
My Commission Expires 8/9/2010



NORTH CAROLINA
*the state of minds*

Profiles of Industry

Over the past 20 years, North Carolina has transitioned from a traditional economy based on tobacco, furniture and textiles – to a global economy that is driven by knowledge-based enterprises – including advanced manufacturing, software and information technology, bio-pharmaceuticals and financial services.

The state's economic transition is also evident within traditional industry sectors. **Agriculture remains vital** with a shift in focus from tobacco to new crops that fuel such areas as wine-making and biotechnology.

Our textile manufacturers have produced high-tech innovations in the area of nonwoven textiles and engineered fabrics.

With the fourth largest military presence in the nation, the **defense-related industry** plays a significant role providing ample opportunities through government contracting.

A number of industry sectors have capitalized on our strategic advantages and achieved national prominence including:

**Biotechnology, Pharmaceuticals and Life Sciences**
**Business and Financial Services**
**Chemicals, Plastics and Rubber**
**Information and Communications Technologies**
**Motor Vehicles and Heavy Equipment**
**Textiles, Apparel and Textile Machinery**

Biotechnology, Pharmaceuticals and Life Sciences

*North Carolina is one of the few states offering a unique, comprehensive environment for biotechnology firms where entrepreneurs can take an idea conceived in a laboratory, refine the product, produce and test it through the clinical trial phases and manufacture and distribute to global markets.*

According to Ernst & Young, North Carolina has the **third largest biotechnology industry in the nation** with nearly 400 bioscience companies, contract research organizations and device and life science-related companies. More than 48,000 highly skilled workers, including some 5,000 biotechnology-related scientists and researchers are employed by this sector. Among the state's largest biotech and pharmaceutical firms are GlaxoSmithKline, Merck, Bayer, Biogen IDEC, Diosynth, Novo Nordisk, Wyeth and Baxter.

To help meet the industry's ongoing need for trained professionals, we have created the country's first **comprehensive biotechnology training program** that partners industry, government and academia through the North Carolina Biomanufacturing and Pharmaceutical Training Consortium.

For more information, download the 📄 North Carolina Biotechnology, Pharmaceutical and Life Sciences Brochure.

Back to Top ▲

Business and Financial Services

Banking and finance comprise one of North Carolina's largest economic sectors, employing nearly 200,000 workers. Operations span the full range of mortgage and insurance centers, headquarters, back-office environments, global business centers and customer service centers.

Our banking and finance operations have earned these distinctions:

- The **second largest financial center** in the nation.

- **Headquarters for three of the nation's 10 largest banks: Bank of America** and **Wachovia** in Charlotte and **BB&T** in Winston-Salem.

- Home to one of the **largest family-controlled banks**: Raleigh-based **First Citizens**.

- Home to several **foreign banks** including the Royal Bank of Canada operating as **RBC Centura**.

More than 260 financial service companies are located in the Charlotte region alone. Among those with major operations in the state are CitiFinancial, GE Capital, Wells Fargo Home Mortgage, Allstate, MetLife, State Farms and Travelers, Kemper, Liberty Mutual and many more.

**Credit Suisse First Boston's Global Business Center**, located in the Research Triangle Park, houses global support staff, including securities operations and information technology positions. **Fidelity Investments** plans to invest $100 million to expand and diversify its current operations in Research Triangle Park.

**Nearly 200 customer service centers** support consumer, financial, insurance, telecommunications and other organizations statewide.

Back to Top ↑

Chemicals, Plastics and Rubber

More than 560 U.S. and international companies in North Carolina provide a solid base for manufacturing materials, equipment, parts and molds. Our innovative and growing polymers industry stakes claims to:

- The **seventh largest plastics manufacturing state** in the nation for shipments.

- The **eighth largest in plastics industry employment** in the nation.

- Plastic and rubber is **third largest export industry** in North Carolina.

- Chemicals **is sixth largest export industry in the state**.

Alcatel, Americhem, DuPont, GE-Polymerland, INVISTA, Kimberly Clark, Owens-Illinois, Southeastern Container, Southern Film Extruders and Wellman are among the state's largest plastic, rubber and chemical related facilities.

Our state programs **meet workforce needs** ranging from plastics technicians to chemical engineers. Opportunities span engineering, chemistry and related degree programs offered at the state's colleges and universities, to specialized plastics training programs with the North Carolina Community College System including:

- N.C. Community College Plastics Curriculum Standards
- The Materials Testing Lab at Isothermal Community College
- The Polymers Center of Excellence
- The Plastics Injection Molding Training Program at Asheville-Buncombe Technical Community College

For more information, download the 🔲 North Carolina Plastics, Rubber, and Related Chemicals Industry Brochure.

Back to Top ↑

Information and Communications Technologies

North Carolina is a major center for telecommunications, networking and software development with 2,500 IT companies employing more than 200,000 highly skilled workers.

North Carolina has been recognized for being:

- #1 producer of **fiber optic cable** in the world.
- 10th best state for using **digital technology**.
- Home to the top **five telecommunication centers** in the world.
- Home to approximately 15% of the nation's **networking engineers**.
- The creator of over 15% of the world's **visual technologies**.
- Recipient of **6,719 recent patents** granted to 228 North Carolina companies.

universities and individuals in our state – almost double the national average.

IBM has its largest IT presence in the world in North Carolina. Cisco's second largest campus is in Research Triangle Park, and Microsoft's second largest domestic presence is in Charlotte. Other major players that have been drawn by North Carolina's knowledge workers are:

- **Cree**
- **CipherOptics**
- **Dell**
- **Google**
- **Lenovo**
- **Peopleclick**
- **Red Hat**
- **RF MicroDevices**
- **SAS**

Specialized resources provide an atmosphere for innovation including:

- **Nine research universities** with three excellent engineering schools.
- The **North Carolina Technology Association** dedicated to growing and strengthening the IT industry.
- The **Charlotte Research Institute** located on the UNC-Charlotte Campus.
- The **North Carolina Council for Entrepreneurial Development** founded to stimulate the creation and growth of high impact companies.

For more information, download the 📄 North Carolina Information and Communication Technologies Brochure.

Back to Top ↑

Motor Vehicles and Heavy Equipment

With more than 1,000 auto industry companies and major commercial truck assembly operations, we rank among the nation's largest **auto parts manufacturers** with major sectors in:

- **Trucks, buses and heavy equipment** – more than 60 companies.
- **Aftermarket** – at least 190 companies.
- **Racing and motorsports** – a $45 billion industry in the state
- **Original equipment manufacturers** – more than 160 companies.

North Carolina's auto workers perform a variety of jobs for major manufacturers:

- Assemble **school and transit buses** for Thomas Built Buses.
- Manufacture **heavy duty trucks** for Freightliner, a subsidiary of DaimlerChrysler.
- Build **transmissions** for AW North Carolina Inc.
- Produce **construction machinery** for Caterpillar.
- Make **suspension components** for ZF Lemforder.
- Assemble **small engines** for lawn mowers and power equipment for Honda Power Equipment Manufacturing.
- Manufacture **power train equipment** for Getrag Corp.
- Design **high-performance race vehicles** for NASCAR championship winners.

**NASCAR** and its Research and Development Center call our state home as well as 90% of the NASCAR teams who have their operations here. North Carolina also created and funded the non-profit **Advanced Vehicle Research Center** in Garysburg in 2008 to provide a modern automotive testing facility for use in the design, development, testing and certification of advanced vehicle technologies, sub-systems and components. Our other industry and higher education partnerships with state universities and community colleges address industrial needs through applied research and development, consulting, specialized worker training, manufacturing certification programs, and automotive curricula.

For more information, download the 📄 North Carolina Automotive Brochure.

Back to Top ↑

Textiles, Apparel and Textile Machinery

Textile manufacturers in North Carolina have emerged as high-tech innovators and established the state as a world leader in nonwoven textiles with engineered fabrics produced through sophisticated processes.

Our growing center for textile manufacturers has garnered these accolades:

- Home to **over 1,500 textile complex facilities** employing over 180,000 people with a $2.8 billion payroll.

- **185 of these companies** are headquartered in North Carolina.

- **Over $35 billion in annual revenues.**

- **144 new or expanded textile operations** since 2003.

- **#1 textile mill employer** in the nation.

- **#4 apparel producer** in the nation.

- **#1 nonwoven roll goods producer** in the nation.

- **#1 yarn producer** in the nation with many of the world's largest companies.

- Home to **4 of the top 5 suppliers of home textiles.**

Some 35 nonwoven manufacturing firms are located in the state with nearly $3 billion in annual sales. German-owned Freudenberg, the world's largest producer of nonwovens has a large plant that produces its **Novolon** product line, which was first developed at N.C. State University. Other newcomers include Japan's **Livedo Corp.**, Jacob Holm Industries of Switzerland and two Israeli firms, N.R. Spuntech Industries and AFG Wipes. Start-ups like **3Tex** that license technology from universities are also common.

We offer resources to support future growth and expansion such as:

- **The American Association of Textile Chemists and Colorists,** the world's leading not-for-profit professional association for the textile design, materials, processing, and testing industries.
- **The Association of Nonwoven Fabrics Industry (INDA)** promoting the growth and profitability of the nonwovens/engineered fabrics industry.
- **The College of Textiles at N.C. State University,** recognized as the world leader in textile education, research and industry support.
- **Cotton Inc.** dedicated to improving and expanding markets for cotton.
- **The Hosiery Technology Center** assisting companies with research and development projects.
- **The Institute of Textile Technology** at N.C. State University educating graduate students in the theory and practice of textile technology, carrying out research in the field, and providing a center of information to keep the industry abreast of international developments in textiles.
- The 58-campus **N.C. Community College System'**s customized training programs.
- **The Nonwovens Cooperative Research Center** at N.C. State University devoted to advancing the knowledge in nonwoven technologies.
- **The Textile/Clothing Technology Corporation ([TC]2)** operating a short-cycle apparel and related sewn products production facility in Cary, N.C. that serves as a demonstration center for leading edge technologies and a research facility for emerging technologies and business processes in the industry.
- **Textile Extension Education Services** at N.C. State University with short courses ranging from Basic Textiles to Six Sigma.
- **The Textile Protection and Comfort Center** at N.C. State University incorporating a comprehensive infrastructure of equipment and personnel to address the need for integrated research on all aspects of the protection and comfort of clothing.
- **The Textile Technology Center** with testing, product prototyping and sample production services.

For more information, download the  North Carolina Textile, Apparel, Hosiery, and

Textile Machinery Brochure. You can also visit www.TextileConnect.com.

© 2008 NC Department of Commerce          (919) 733-4151
Building Location:
301 North Wilmington Street
Raleigh, NC 27601-1058
Mailing Address:
4301 Mail Service Center
Raleigh, NC 27699-4301



ASA Late Model Series Northern Division

# ASA Late Model Series

**ASA Late Model Series • North Division. Series Development & Vision for the Future The Nations' Premier Short Track Series will be running a Northern, Southern and Challenge Touring Series in 2006. The North and South Divisions will meet the racers needs at the grassroots level and offer affordable, professional racing.**

**Kelly Bires and Hunter Robbins to drive for Waltom Racing in 2006.**

**Posted January 31st, 2006**



Kelly Bires (Top) and Hunter Robbins (Bottom) will both compete for the 2006 Pat Bourdow Memorial Rookie of the Year title in the ASA Late Model Series Challenge Division. Both drivers will be teammates for the potent WalTom Racing Team. (WalTom Racing Photos)

By WalTom Racing
Riverside, Illinois (01/31/2006): After experiencing success beyond their wildest dreams in 2005, WalTom Racing is stepping up to the plate in a big way in 2006. To follow up on earning the ASA Late Model Series Championship last season with Stephen Leicht, the team will field two cars in the ASA Late Model Challenge Series in 2006 for drivers Kelly Bires and Hunter Robbins

The 21-year-old Bires, a native of Mauston, WI, will drive the #89 that Leicht drove to the championship in 2005. Robbins, a 14-year-old hotshoe from Montgomery, AL, will drive the #98. Both drivers will compete for the Pat Bourdow Memorial Rookie of the Year and the ASA Late Model Challenge Series championship. Bires will also race a select number of races in the ASA Late Model Series Northern Division schedule. The teams will be sponsored by Texor Petroleum, GM Performance Parts, Howe Racing, Lafayette Coal and McMahon Cartage.

"We're real excited about both of these drivers," said John Mulvenna, Director of Motorsports for WalTom Racing. "Kelly has exceptional car control and feedback and has been a great addition to our crew by helping build new cars for the upcoming season. Hunter is definitely racing beyond his years. He reminds me a little of Stephen, only two years younger. It's going to be a busy and hopefully exciting season."

Bires has been racing since the age of nine, when his career began in go-karts. After winning two consecutive National Championships in go-karts and several regional titles, Bires entered the Great Lakes Allison Legacy Series at the age of 15. In 2001, he was named Great Lakes Allison Legacy Champion after a dominating year. He won seven races and the point's championship. Bires then moved up to the super-competitive Super Late Model division in Wisconsin. He was rookie of the year at Wisconsin Dells Motor Speedway. Bires also competed in his first-career ARCA race in May of 2004 at Lowes Motor Speedway, where he posted an eighth-place finish.

In December, Bires made his first start for WalTom Racing by driving the #89 in the Snowflake 100 during the Snowball Derby weekend. Bires ran in the top five most of the night before getting caught up in a late-race accident. He finished 23rd.

"This is a great opportunity for me to be with an organization like WalTom Racing," said Bires. "It is a real honor

to race for these guys after going through the process that I have with them. I think I'll be able to bring a lot to them, but I'll learn even more from them. They are a team that does what they need to get the job done and I feel very confident in working with them. Their success is already evident with Stephen Leicht and hopefully we can continue that this year."

Robbins began his racing career at the tender age of six in go-karts. He won his first track championship in his first season racing while competing against competitors as old as 12. At 11, he graduated to Bandoleros, where he competed nationally. Robbins finished second in points at Atlanta Motor Speedway and ninth at Lowe's Motor Speedway. Along with those accomplishments came the Bandolero National Championship.

Robbins then moved to the Pro Late Model division that runs around the Southeast. Robbins finished second in the Pro Late Model championship at Montgomery Motor Speedway and won the 2004 Alabama 250. However, Robbins' biggest win came at Five Flags Speedway at the end of 2005, when he won one of the most prestigious races of the year, the annual Snowflake 100 during the Snowball Derby weekend.

"I think it is a great opportunity to get to work with WalTom Racing," said Robbins. "I am just going to try to do my best and make the most out of it. I met the WalTom guys at Pensacola during the Snowball Derby weekend. I just introduced myself to them and we talked a little and everything just came from there.

"I'd like to get Rookie of the Year. It will be a great opportunity working with Howie (Lettow) and all of the guys with the team. I just want to do the best I can. If I do that, things will hopefully take care of themselves."

The ASA Late Model Challenge Series will open the season on Friday and Saturday, March 17th-18th, at the Music City Motorplex (TN) for the Music City 200. The Northern Division will open the season at I-70 Speedway on May 6th.

WalTom Racing, with Kelly Bires and Hunter Robbins, will compete on the ASA Late Model Challenge Series tour in 2006. For more information on the team, please visit www.waltomracing.com or call Jeremy Troiano at 704-455-2051

This entry was posted on Tuesday, January 31st, 2006 at 3:11 pm.





## ASALM North Stats & Info

- Front Page
- Press Releases
- Schedule/Race Event Information/Results
- Standings
- Event Fliers
- Official Forum

- Driver Roster
- Marketing Partners
- Classifieds



Photo Gallery

## Inside the ASALM North

- About ASA Late Model Series
- Register for Series
- '08 Series RuleBook  PDF File
- Tech Information
- Engine Rebuilders  PDF File
- File Downloads
- Contact Series Officials
- Email List
- Marketing Information



## Inside the USPRO Cup Series

- Press Releases
- Schedule/Race Event Information/Results
- Standings
- Downloads/Fliers



**Which 2007 Champion do you think has the best chance for a repeat year?**

- ◌ Travis Dassow
- ◌ Trent Snyder
- ◌ Jeff Choquette

[ Vote! ]
View results



ASA Late Model North Series
ASA Late Model South Series
ASA Late Model Series

© Copyright 2005 ASA Late Model Series LLC. All rights reserved.
Powered by ADVANTAGE Motorsports Marketing Inc..
RSS News Feed | Contact ASALM