IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| KELLY BIRES, )<br>)<br>   *Plaintiff,* )<br>)<br>v. )<br>)<br>WALTOM, LLC D/B/A WALTOM RACING, )<br>LLC, )<br>)<br>   *Defendant.* )<br>) | CASE NO.<br>1:07-CV-959-JAB-WWD |

## REPLY MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO TRANSFER VENUE

Defendant, WalTom, LLC d/b/a WalTom Racing, LLC ("WalTom"), hereby submits this Reply Memorandum in further support of its Motion to Transfer Venue.

### PRELIMINARY STATEMENT

Plaintiff's opposition to WalTom's Motion is based almost exclusively on the faulty and fictional argument that the "real agreement" between the parties was formed through some oral conversation in North Carolina and that the written Professional Driving and Sponsorship Agreement (the "Agreement") executed by both parties (referred to by Plaintiff in his brief as the "contract at issue") is somehow a subsequent unenforceable agreement. This argument is unsupported by both the facts and the law. Plaintiff's mistaken belief that a contract was formed in North Carolina similarly taints his flawed analysis of the motion to transfer factors (*see* Pl. Br. at 10-19) and WalTom's Motion should be granted due to both the valid and enforceable forum selection clause in the Agreement specifying Illinois and the weight of the factors favoring transfer to Illinois.

1

**FACTUAL BACKGROUND**

Contemporaneously with the filing of WalTom's Motion, WalTom submitted a declaration from its general manager, John Mulvenna.[1] In that declaration, Mr. Mulvenna stated, among other facts: "[f]ollowing [driver] testing in late 2005 [in Hudson, NC], WalTom selected Plaintiff, Kelly Bires, to be its driver for the 2006 season. Plaintiff accepted WalTom's offer to be its driver." Mulvenna Decl. at ¶ 9. After negotiations involving the parties and their respective lawyers, the Agreement was executed by the parties in February 2006. *Id.* at ¶¶ 11-15. As correctly stated by Mr. Mulvenna, the offer and acceptance of Plaintiff's right to drive for WalTom therefore necessarily occurred *following* the driver testing in North Carolina.

Plaintiff, however, misconstrues Mr. Mulvenna's statement and erroneously represents to the Court that the offer to drive for WalTom was extended to Plaintiff *immediately* following the testing – while the parties were in North Carolina. Pl. Br. at 2-3. Through this improper interpretation of the declaration, which forms the linchpin of Plaintiff's opposition to the Motion, Plaintiff attempts to twist Mr. Mulvenna's statement into an admission by WalTom that a contract was formed in North Carolina. That is not true.

Contrary to Plaintiff's assertion, Plaintiff was not offered the chance to drive for WalTom immediately after the driver testing held in Hudson, North Carolina in November 2005. In fact, WalTom never extended an offer to Plaintiff in North Carolina. Supplemental Declaration of John Mulvenna ("Mulvenna Supp. Decl.") at ¶ 4.[2]

---

[1] The Mulvenna Decl. was attached to Defendant's Motion as Exhibit A.
[2] The Mulvenna Supp. Decl. is attached hereto as <u>Exhibit 1</u>.

2

Instead, after reviewing the testing results, WalTom narrowed its list of candidates and entered (at its own expense) Plaintiff and another driver candidate, Josh Adams, in a race in Pensacola, Florida in December 2005. Prior to entering the Snowflake 100 on December 3, 2005, Plaintiff and Adams each signed a "stand-still" agreement with WalTom on December 2 whereby each driver agreed not to enter into negotiations with another race team for 45 days. The agreement – which was not an offer to drive for WalTom – also stated: "On or before January 14, 2005 [sic], WalTom agrees to notify Driver of their intentions via a formal driving contract or a release of responsibility allowing Driver to then pursue other driving opportunities. The actual terms and conditions of the formal driving contract shall be subject to the mutual agreement of WalTom and Driver."[3] *Id.* at ¶ 5 (*see also id.* at fn. 1).

WalTom then began negotiations with Plaintiff regarding the Agreement in January 2006.[4] *Id.* at ¶ 6. When WalTom offered Plaintiff the chance to drive for WalTom, Plaintiff knew the terms of the relationship would be memorialized in a written contract. Plaintiff also knew that contract would contain a royalty provision such as that set forth in the Agreement. *Id.* at ¶ 7. Plaintiff's chief concern during the drafting and negotiation of the Agreement was not the royalty provision, but that he receive enough compensation, through salary and race winnings, on which to live. *Id.* at ¶ 8.

---

[3] True and accurate copies of the "stand-still" agreements signed by Plaintiff and Adams are attached to the Mulvenna Supp. Decl. as Exhibits 1 and 2, respectively.

[4] Again, contrary to Plaintiff's claim in his Brief that the 2006 race season had already begun when he was presented with the Agreement (Pl. Br. at 9), the first race did not take place until March 22, 2006, which is after the Agreement was signed by both parties. Mulvenna Supp. Decl. at ¶ 6.

Plaintiff voluntarily made the decision to rent an apartment near WalTom's race shop in Wisconsin – before the Agreement was finalized – and he borrowed money from WalTom to pay the security deposit on the new apartment. Though Plaintiff's Brief suggests otherwise, Plaintiff already lived in Wisconsin – he did not move there at the behest of WalTom. WalTom did not require or ask Plaintiff to lease an apartment or start working at the race shop prior to the execution of the Agreement. *Id.* at ¶ 10.

## ARGUMENT

A. **THE ONLY CONTRACT THAT EXISTS BETWEEN THE PARTIES IS THE WRITTEN PROFESSIONAL DRIVING AND SPONSORSHIP AGREEMENT WHICH WAS EXECUTED IN ILLINOIS.**

"In order for a valid contract to exist, the parties must assent to the same thing in the same sense, and their minds must meet as to all the terms." *Howell v. Allen & Co.*, 8 N.C. App. 287, 289, 174 S.E.2d 55, 56 (1970) (internal citations omitted). "An offer must be definite and complete, and a mere proposal intended to open negotiations which contains no definite terms but refers to contingencies to be worked out cannot constitute the basis of a contract, even though accepted." *Id*. Compensation is an essential ingredient of every contract for the rendering of services and must be definite and certain in order for the contract to be binding. *See id*.

While Plaintiff alleges "the real agreement…occurred as a result of WalTom's offer to Bires to drive for WalTom and Bires [sic] acceptance of the same" (Pl. Br. at 2), any purported offer and acceptance occurring before the Agreement, regardless of where it took place, did not form a binding contract. WalTom's selection of Plaintiff as a driver was not a "definite and complete" offer, but was merely a proposal intended to open negotiations which contained *no definite terms including compensation*, an essential

4

ingredient to service contracts. *See Howell*, 8 N.C. at 289, 174 S.E.2d at 56. Further, because no compensation term was agreed upon in any initial oral conversation – regardless of where it took place – before the execution of the Agreement, any alleged "contract" other than the Agreement would fail for lack of consideration.[5]

A valid contract does not exist if material portions of the agreement are left open for future agreement. *Chappell v. Roth*, 353 N.C. 690, 548 S.E.2d 499 (2001). "There is no meeting of the minds, and, therefore, no contract, when in the contemplation of both parties something remains to be done to establish contract relations. This rule has been described as too well established to require the citation of authority…Likewise, when negotiating parties make it clear that they do not intend to be bound by a contract until a formal written agreement is executed, no contract exists until that time." *Parker v. Glosson*, 182 N.C. App. 229, 232, 641 S.E.2d 735, 737 (2007) (internal quotations and citations omitted). "[A] contract that leaves material portions open for future agreement is nugatory and void for indefiniteness." *Miller v. Rose*, 138 N.C. App. 582, 588, 532 S.E.2d 228, 232 (2000) (internal quotations and citations omitted). When WalTom offered Plaintiff the chance to drive for WalTom – not in North Carolina – Plaintiff knew the terms of the relationship would be memorialized in a written contract. Plaintiff also knew that written contract would contain a royalty provision such as that set forth in the Agreement. Mulvenna Supp. Decl. at ¶ 7. Plaintiff's chief concern during the drafting and negotiation of the Agreement was not the royalty provision, but that he receive

---

[5] The fact that WalTom executed a 45-day "stand-still" agreement with *two* drivers on December 2, 2005 offers further irrefutable evidence that no offer to drive had been extended to Plaintiff in North Carolina – let alone the formation of a contract – as that document expressly states that WalTom will announce its intentions to Plaintiff on or before January 14, 2005 [sic] "via a formal driving contract." Mulvenna Supp. Decl. at Exhibits 1 and 2.

enough compensation, through salary and race winnings, on which to live. *Id*. at ¶ 8. The written and executed Agreement therefore constitutes the only contract between WalTom and Plaintiff.

In addition to the aforementioned reasons why any oral offer to drive for WalTom does not constitute a contract, any discussions the parties had before execution are superseded by the Agreement by virtue of a valid and enforceable integration clause:

> Entire Agreement: This Agreement is the entire agreement of the parties and supersedes any other or collateral agreement (oral or written) between the parties in any manner relating to the subject matter hereof. This Agreement may only be modified, altered or amended by an instrument in writing signed by the party sought to be charged.

Agreement at ¶ 11.[6] Under Illinois law, integration clauses are enforceable and bar evidence of prior agreements not included in an unambiguous written agreement.[7] *Brooklyn Bagel Boys, Inc. v. Earthgrains Refrigerated Dough Prods., Inc.*, 212 F.3d 373, 380 (7th Cir. 2000) (holding that a contract that contains an integration clause stating the contract "constitutes the entire agreement of the parties," and "supersedes all prior or contemporaneous agreements" is a complete expression of the whole agreement). Likewise, the Agreement is a complete and unambiguous expression of the contract between Plaintiff and WalTom and supersedes any prior discussions or alleged "real agreement."

---

[6] The Agreement is attached to the Mulvenna Decl. as Exhibit 1.

[7] It is also well-established under North Carolina law that "no verbal agreement between the parties to a written agreement, made before or at the time of the execution of such contract, is admissible to vary its terms or contradict its provisions." *Static Control Components v. Mitsubishi Kagaku Imaging Corp.*, 2007 U.S. Dist. LEXIS 12316, *10 (M.D.N.C. Feb. 21, 2007) (quoting *Borden, Inc. v. Brower*, 284 N.C. 54, 60, 199 S.E.2d 414, 418 (1973). This is especially true when the agreement contains an integration clause specifying that the agreement constitutes the entire agreement of the parties. *See, e.g., Tar River Cable TV, Inc. v. Standard Theatre Supply Co.*, 62 N.C. App. 61, 302 S.E.2d 458 (1983).

**B.　THE FORUM SELECTION CLAUSE SPECIFYING ILLINOIS IS VALID AND ENFORCEABLE.**

As detailed in WalTom's original brief at pages 6-10, this action should be transferred because the parties agreed that any dispute concerning the Agreement must be brought in the Northern District of Illinois and Plaintiff is unable to overcome the presumption of validity that exists for such clauses in the Fourth Circuit. Plaintiff's contention that the forum selection clause is invalid due to the purported invalidity of the entire Agreement is unavailing since the forum selection clause is severable.[8] *See* Def. Br. at fn. 4.

Plaintiff's attempt to make this a David vs. Goliath struggle similarly falls flat considering Plaintiff was represented by counsel during the negotiations, he in fact negotiated certain provisions of the Agreement, and he jumped at the chance to drive for WalTom as long as he earned sufficient compensation. Mulvenna Decl. at ¶¶ 12, 13, 24; Mulvenna Supp. Decl. at ¶ 8, 10.[9] Ironically, however, Plaintiff has now apparently warmed to the role of the underdog and is using this very lawsuit to slay WalTom by shirking his contractual obligations and attempting to void the Agreement.

---

[8]　Likewise, Plaintiff's arguments about the application of North Carolina law and N.C. Gen. Stat. § 22B-3 (Pl. Br. at 11) are inapposite given the legally and factually incorrect argument that the parties' contract was formed in North Carolina as detailed *supra*.

[9]　Plaintiff's arguments to support his contention of overreaching distort, at best, or misrepresent, at worst, the actual facts. For example, contrary to his assertions on page 9 of his brief, Plaintiff is a Wisconsin native who already lived there before renting an apartment closer to WalTom's race shop (Mulvenna Supp. Decl. at ¶ 10) and the 2006 race season did not begin until after the Agreement was executed. *Id.* at ¶ 6.

7

C.  **THE MOTION TO TRANSFER FACTORS ESTABLISHED BY THE COURTS FAVOR TRANSFER TO THE NORTHERN DISTRICT OF ILLINOIS.**

WalTom will not rehash its analysis of the factors as set forth in its original Memorandum.  *See* Def. Br. at 10-17.  However, at least a couple distinctions from Plaintiff's analysis bear discussion.

For example, Plaintiff's decision to file his lawsuit in North Carolina does not outweigh his initial choice of an Illinois forum in the Agreement.  *See St. Andrews Presbyterian Coll. v. S. Ass'n of Colls. and Schs., Inc.*, 2007 U.S. Dist. LEXIS 87953, *26 (M.D.N.C. Nov. 29, 2007); *see also* Def. Br. at 11-12.  Further, because the Agreement was not entered into in North Carolina, N.C. Gen. Stat. § 22B-3, "and its corresponding public policy against out-of-state forum selection, does not apply." *Id.* at *24.

Plaintiff also claims "access to proof" and "convenience of witnesses" favor retention of the suit in North Carolina.  While the primary witnesses for WalTom will likely be its officers, there are numerous additional witnesses who will be necessary if Plaintiff persists in his claim that his contract was entered into in North Carolina or that WalTom failed to provide adequate consideration or services under the Agreement. Mulvenna Supp. Decl. at ¶ 11.  There is no doubt that driving to Illinois from other Midwestern states is considerably more convenient for such witnesses than flying to North Carolina.

Finally, WalTom is troubled by Plaintiff's apparent intention to refuse to pay WalTom its share of royalties under the Agreement if the Agreement is upheld by the Court.  Despite stating in his brief that this suit "concerns only the validity and

8

enforceability of the contract at issue" (Pl. Br. at 13), Plaintiff argues the Motion should be denied because North Carolina is home to all of the witnesses who would be relevant to a breach of contract counterclaim related to Plaintiff's earnings. (*Id.* at 15). Should WalTom prevail in the declaratory judgment action (which it believes it will), WalTom expects Plaintiff to honor his payment obligations under the Agreement. Unless Plaintiff is already declaring his intent to breach the Agreement, North Carolina witnesses and documents are irrelevant in the Court's analysis of the transfer factors as such persons would only be necessary witnesses in the event Plaintiff fails to comply with the Agreement.

After conducting an analysis of the relevant factors, this Court in *St. Andrews* granted Defendant's Motion to Transfer and held – just three months ago – that "while some of the factors advanced by [plaintiff] arguably could weigh in favor of not transferring this action, their weight is not greater than the weight of the valid and enforceable forum selection clause." 2007 U.S. Dist. LEXIS 87953 at *27. WalTom respectfully contends the same decision should be reached in this case.

## CONCLUSION

Based on the foregoing and the materials previously filed by WalTom, Defendant's Motion to Transfer Venue should be granted.

This 7th day of March, 2008.

    /s/ Christopher C. Lam
John H. Culver III
N.C. State Bar No. 17849
Christopher C. Lam
N.C. State Bar No. 28627
Kennedy Covington Lobdell & Hickman, L.L.P.
214 North Tryon Street, 47th Floor
Charlotte, NC  28202
Telephone:  704-331-7449
Facsimile:  704-353-3149
clam@kennedycovington.com
ATTORNEYS FOR DEFENDANT

## CERTIFICATE OF SERVICE

I hereby certify that on March 7, 2008, I electronically filed the foregoing *REPLY MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO TRANSFER VENUE* with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to the following attorney of record:

> William Bray
> The Bray Law Firm, PLLC
> 4701 Hedgemore Drive, Suite 816
> Charlotte, North Carolina 28209
> wbray@braylaw.com
> *Attorneys for Plaintiff*

I have also caused to be deposited a copy of the same in an official depository of the United States Postal Service in a postage-paid envelope addressed to Plaintiff's counsel at the above address.

This 7th day of March, 2008.

/s/ Christopher C. Lam
Christopher C. Lam

EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| KELLY BIRES,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>WALTOM, LLC d/b/a WALTOM RACING, LLC,<br><br>　　　　　Defendant. | CASE NO.<br>1:07-CV-959-JAB-WWD |

### SUPPLEMENTAL DECLARATION OF JOHN MULVENNA
### IN SUPPORT OF DEFENDANT'S MOTION TO TRANSFER VENUE

John Mulvenna, being duly sworn under oath deposes and states that the following facts are true and accurate to the best of his knowledge and belief:

1.　　I am over the age of 21 and am under no legal disability.

2.　　I have reviewed Plaintiff's Memorandum in Opposition to Motion to Transfer Venue ("Plaintiff's Brief") and the supporting exhibits and make this Supplemental Declaration based on my personal knowledge and in further support of Defendant's Motion to Transfer Venue.

3.　　Plaintiff's misinterpretation of paragraph 9 of my original Declaration apparently forms a major basis for his opposition to Defendant WalTom, LLC d/b/a WalTom Racing, LLC's ("WalTom") Motion. Plaintiff suggests "the real agreement" between the parties somehow occurred through an oral agreement in North Carolina, as opposed to the written Professional Driving and Sponsorship Agreement (the

"Agreement") executed by Plaintiff in Wisconsin on February 7, 2006 and by WalTom in Illinois on February 9, 2006.

4.     Contrary to Plaintiff's assertion, Plaintiff was not offered the chance to drive for WalTom immediately after the driver testing held in Hudson, North Carolina in November 2005. In fact, WalTom never extended an offer to Plaintiff in North Carolina.

5.     Instead, after reviewing the testing results, WalTom narrowed its list of candidates and entered (at its own expense) Plaintiff and another driver candidate, Josh Adams, in a race in Pensacola, Florida in December 2005. Prior to entering the Snowflake 100 on December 3, 2005, Plaintiff and Adams each signed a "stand-still" agreement with WalTom on December 2 whereby each driver agreed not to enter into negotiations with another race team for 45 days. The agreement – which was not an offer to drive for WalTom – also stated: "On or before January 14, 2005 [sic][1], WalTom agrees to notify Driver of their intentions via a formal driving contract or a release of responsibility allowing Driver to then pursue other driving opportunities. The actual terms and conditions of the formal driving contract shall be subject to the mutual agreement of WalTom and Driver." A copy of the "stand-still" agreement executed by Plaintiff is attached hereto as Exhibit 1. A copy of the "stand-still" agreement executed by Adams is attached hereto as Exhibit 2.

---

[1]  The January 14, 2005 date referenced in the "stand-still" agreements is a typographical error. This date should obviously have read January 14, **2006** since the agreements were dated December 1, 2005, executed on December 2, 2005, and related to a 45-day period extending into January 2006.

6. WalTom began negotiations with Plaintiff regarding the Agreement in January 2006. Though Plaintiff claims in his Brief that the 2006 race season had already begun when he was presented with the Agreement (Plaintiff's Brief at 9), the first race did not take place until March 22, 2006 in Nashville, Tennessee, which is after the Agreement was signed by both parties.

7. When WalTom offered Plaintiff the chance to drive for WalTom, Plaintiff knew the terms of the relationship would be memorialized in a formal written contract. Plaintiff also knew that contract would contain a royalty provision such as that set forth in the Agreement.

8. Plaintiff's chief concern during the drafting and negotiation of the Agreement was not the royalty provision, but that he receive enough compensation, through salary and race winnings, on which to live.

9. The offer and acceptance, including the accompanying negotiations around the terms of the Agreement and the execution of the Agreement, took place primarily in Illinois and Wisconsin, and no offer, acceptance, or negotiations occurred in North Carolina.

10. Plaintiff also voluntarily made the decision to rent an apartment near WalTom's race shop in Wisconsin – before the Agreement was finalized. Plaintiff, of course, already lived in Wisconsin, but borrowed money from WalTom to pay the security deposit on the new apartment. WalTom did not require or ask Plaintiff to lease an apartment or start working at the race shop prior to the execution of the Agreement. He wanted to work in WalTom's race shop immediately to work with our team to help prepare and build additional race cars, learn from our legendary crew chief, etc. Plaintiff

was not strong-armed into doing anything. It was just the opposite. Plaintiff was pushing WalTom to move faster than we could and we tried to accommodate him as best we could.

11.  While the primary witnesses for WalTom will likely be its officers, there are numerous additional witnesses who will be necessary if Plaintiff persists in his claim that his contract was entered into in North Carolina or that WalTom failed to provide adequate consideration or services under the Agreement. Such witnesses may include: Tom Gleitsman (IL), Walter Gleitsman (IL), Howard Lettow (WI), Chris Purdy (WI), Ron Tretow (WI), Chas Howe (MI), other former WalTom employees living in Illinois and Wisconsin, ASA racing competitors living in the Midwest, and ASA personnel living in the Midwest. Driving to Illinois is considerably more convenient for these witnesses than flying to North Carolina.

***************************

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 6th day of March, 2008.

_____
JOHN MULVENNA



December 1, 2005

Driver: Kelly Bires

On November 17 and 18, 2005, WalTom Racing completed an on-track and off-track evaluation of Driver at Tri-County Motor Speedway and now WalTom desires to further this testing by entering Driver in the Snowflake 100 on December 3, 2005 at Five Flags Speedway in Pensacola, FL at WalTom Racing's sole cost and expense.

In consideration of the above, for a period of forty-five (45) days beginning on Thursday, December 1, 2005 and ending on January 14, 2005, Driver agrees that he nor any representative or agent will not participate in any form of negotiations or discussions regarding Driver's driving services with any other race team other than WalTom Racing. In the event that Driver is presented an unsolicited bona fide offer for Drivers' driving services during the period state above from any other race team or their agents or representatives, Driver agrees to turn down any such offer until the time frame of this agreement is completed.

On or before January 14, 2005, WalTom agrees to notify Driver of their intentions via a formal driving contract or a release of responsibility allowing Driver to then pursue other driving opportunities. The actual terms and conditions of the formal driving contract shall be subject to the mutual agreement of WalTom and Driver. It is the intention of WalTom to compete full-time in the 2006 ASA Late Model Challenge Series and selected 2006 ASA Late Model North Division Series Events.

Agreed and accepted by:

_____    12/2/05
Kelly Bires, Driver                Date

_____    12/2/05
John Mulvenna, General Manager     Date
WalTom Racing

**EXHIBIT**
1



December 1, 2005

Driver: Josh Adams

On November 17 and 18, 2005, WalTom Racing completed an on-track and off-track evaluation of Driver at Tri-County Motor Speedway and now WalTom desires to further this testing by entering Driver in the Snowflake 100 on December 3, 2005 at Five Flags Speedway in Pensacola, FL at WalTom Racing's sole cost and expense.

In consideration of the above, for a period of forty-five (45) days beginning on Thursday, December 1, 2005 and ending on January 14, 2005, Driver agrees that he nor any representative or agent will not participate in any form of negotiations or discussions regarding Driver's driving services with any other race team other than WalTom Racing. In the event that Driver is presented an unsolicited bona fide offer for Drivers' driving services during the period state above from any other race team or their agents or representatives, Driver agrees to turn down any such offer until the time frame of this agreement is completed.

On or before January 14, 2005, WalTom agrees to notify Driver of their intentions via a formal driving contract or a release of responsibility allowing Driver to then pursue other driving opportunities. The actual terms and conditions of the formal driving contract shall be subject to the mutual agreement of WalTom and Driver. It is the intention of WalTom to compete full-time in the 2006 ASA Late Model Challenge Series and selected 2006 ASA Late Model North Division Series Events.

Agreed and accepted by:

_____    12/2/05
Josh Adams, Driver                  Date

_____    12/2/05
John Mulvenna, General Manager      Date
WalTom Racing

**EXHIBIT 2**