IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

KELLY BIRES,  )
        Plaintiff,  )
)
v.  )    No.    08 C 4680
)    Judge Blanche M. Manning
)
WALTOM, LLC AND TD RACING  )
DEVELOPMENT, LLC,  )
        Defendants.  )

## MEMORANDUM AND ORDER

Plaintiff Kelly Bires filed suit against WalTom, LLC and TD Racing Development, LLC (collectively, "WalTom") seeking a declaratory judgment that the contract the parties entered into is null and void for a variety of reasons. The defendant moves for summary judgment on seven of Bires' eight counts in his First Amended Complaint ("FAC"). In addition, Bires has moved for judgment on the pleadings as to four of the eight counts in his First Amended Complaint. For the reasons stated herein, WalTom's motion for summary judgment is granted in part and denied in part and Bires' motion for judgment on the pleadings is granted in part and denied in part.

**I.    Background**

Prior to laying out the facts, the court notes that each party, in response to certain of the other party's statements of fact, states that it either cannot admit or deny or simply denies the statement of fact because it has insufficient knowledge of that statement of fact. In addition, WalTom denies several of Bires' additional statements of fact without citation to the record. These are inappropriate responses. If a party disputes a fact, it must point to record evidence in support of the denial. If it does not point to record evidence, the court will deem the fact admitted. Thus, to the extent that either party denies a statement of fact because it lacks knowledge or denies a statement of fact but fails to point to any record evidence in support of the denial, these facts will be deemed admitted without specific comment by the court.

Bires is a professional racecar driver by trade and currently competes with great success in prestigious racing series sponsored by the National Association for Stock Car Auto Racing ("NASCAR"). He grew up in Mauston, Wisconsin, which has a population of less than 4,000 people, did not go to college, and is not educated or skilled in any profession other than racing.

In 2004, WalTom had instituted a Driver Development Program to educate and train young drivers such as Bires who demonstrated a superior ability in motorsports. During the calendar year 2005, Bires operated his own race team. Bires does not recall the amount of money he earned prior to driving for WalTom.

In the hopes of driving a full race season schedule in the ASA Late Model Series in 2006 and receiving the instruction, mentoring, and financial support that WalTom could provide, Bires applied for a position with WalTom in October 2005. He was 22 years old. Shortly thereafter, WalTom contacted Bires and invited him to participate, along with other drivers, in a series of driving tests to be held over a period of three days at a test track in Hudson, North Carolina.[1] Bires attests that he had to pay for his flight and lost earnings while he attended the driving test and was "inconvenienced."

WalTom entered Bires in a race in Pensacola, Florida on December 3, 2005. According to Bires, prior to the race, he worked in WalTom's shop for approximately a week and a half without pay and incurred expenses to commute two hours each way on some days.

On December 2, 2005, Bires signed a standstill agreement (which Bires refers to as the "Lock-up Agreement"), that prohibited him from negotiating or signing with another team for 45 days beginning on December 1, 2005. The standstill agreement provided that "for a period of forty-five (45) days beginning on Thursday, December 1, 2005 and ending on January 14, 2005 [sic] [Bires] agrees that he nor any representative or agent will not participate in any form of negotiations or discussions regarding Driver's driving services with any other race team other than WalTom Racing." Plaintiff's Exh. 3. Bires contends that he had no meaningful choice but to sign the standstill agreement because WalTom presented it to him on a take-it-or-leave-it basis. Bires also states that he did not have sufficient time to review the standstill agreement and did not consult with a lawyer about it.

Immediately after signing the standstill agreement, Bires ceased all discussions with all other race teams relating to his driving services, foregoing other purported opportunities. Prior to entering into the first agreement with WalTom in December 2005, Bires was talking to "pretty much anyone and everyone that may have had an opportunity to race with them."

A some point in December 2005, the specific date is disputed by the parties, WalTom and Bires began discussions regarding Bires' driving for WalTom. At some point during that time,

---

[1]Bires states that the "invitation" to test drive was not an "optional or gratuitous one." It is not clear to the court what Bires means. Philosophers have debated about the contours of free will – the capacity of rational agents to choose a course of action from among various alternatives – for hundreds of years. René Descartes, for example, defines free will as "the ability to do or not do something," Meditation IV, http://www.wright.edu/cola/descartes/meditation4.html, and famously opined that "the will is by its nature so free that it can never be constrained," Passions of the Soul, I, art. 41, http://net.cgu.edu/philosophy/descartes/Passions_Letters.html. Bires' position, in contrast, that the invitation was not optional, is premised on his complete lack of any free will whatsoever. While the court will not delve into the philosophical reasons why this contention is questionable, it rejects it as a matter of common sense, given that Bires was not physically constrained and forced to perform a test drive.

Bires, a Wisconsin native, leased an apartment in Hartland, Wisconsin, near WalTom's racing shop. According to Bires, a late December 2005 telephone call between Tom Gleitsman and Bires constituted a "formal offer" of a position with WalTom while subsequent discussions solidified the terms of their relationship. Bires states that these initial conversations resulted in an oral agreement that Bires would race on WalTom's ASA Late Model race team for the 2006 season and he would promptly lease an apartment near WalTom's race shop in Sussex, Wisconsin. In return, Bires asserts that "it was agreed" that WalTom would, among other things, provide instruction and mentoring services, pay Bires a competitive salary sufficient to keep him financially afloat, pay Bires additional compensation based on his finishing positions; pay Bires' living expenses in Sussex, Wisconsin including rent, utilities, dental work, health insurance, and tax preparation services, and pay the expenses associated with running a competitive racing team.

Bires also states that WalTom never informed or indicated to him that its promises would not be binding unless and until a written contract was signed, or that a condition of the agreement was that Bires would pay WalTom a portion of his future income or other consideration. Bires attaches as his Exhibit 9 a copy of a press release announcing Bires as a new driver for WalTom Racing.

WalTom denies that there was an oral agreement and denies the existence of any agreement on any terms beyond those in the written Driving Agreement.[2] WalTom contends that, while it paid Bires for the months of January and February 2006 and paid Bires' security deposit for his apartment, no formal offer of employment was made to Bires until it presented him with an initial version of the Driving Agreement during the second week of January 2006.

After receiving the first version of the agreement, Bires spoke with Tom Gleitsman and John Mulvenna, the General Manager of WalTom, about the contract, including the salary term. The first version of the Agreement presented to Bires provided for a salary of $1,700.00 per month.

Bires states that he "was surprised" to see the 25% royalty provision in the draft Agreement but that the draft did not contain any other "new" obligations (i.e., obligations different from the purported oral agreement) on his part. WalTom estimated that at the time the Driving Agreement was executed it could earn about $7 million from Bires pursuant to the

---

[2]Indeed, WalTom spends the first several pages of its reply brief arguing that an oral contract never existed between the parties. WalTom apparently believes the lack of an oral contract to be dispositive of most of the issues on summary judgment (e.g., stating that "Plaintiff's entire argument hinges on the existence of both an 'Oral Agreement' and a 'Wage Assignment'" and that "[i]f they do not exists, plaintiff's response is a house of cards which falls"), but fails to indicate how that is the case. Indeed, the court cannot ascertain how the existence of an oral contract is relevant to disposition of any of the issues on summary judgment and thus does not address the issue in its order.

royalty provision.

Bires states that he initially refused to sign the written Driving Agreement but that WalTom pressured him to sign it based on the "financial penalties and logistical burdens that he would have suffered had he not signed it." Plaintiff's Statement of Additional Fact , ¶ 53. These penalties and burdens included finding substitute employment, which would have been "nearly impossible" and relocating his residence. Bires ultimately signed the Agreement on February 7, 2009.

The parties appear to dispute what WalTom paid Bires over the course of the Agreement. Pursuant to Bires' deposition, WalTom states that it paid Bires $2,800 before he signed the Agreement and $2,800 "every month after he signed the contract [while Bires drove for them]." In an affidavit filed with his response to WalTom's motion for summary judgment, Bires attests that WalTom paid him $2,800 on January 11, 2006, and another $2,800 on February 1, 2006, before Bires signed the Driving Agreement on February 7, 2006. Bires also attests in his deposition that WalTom then only made two more $2,800 payments, one on March 1, 2006, and one on April 1, 2006.

In addition to salary, WalTom paid Bires an unnamed percentage of race winnings and monetary bonuses. However, Bires denies that WalTom paid all of its own expenses associated with running a competitive racing team.

During the 2006 racing season, Bires won six races and was named the 2006 Challenge Series Rookie of the Year and Challenge Series Champion. The total paid by WalTom in 2006 for race-related expenses was over $730,000. WalTom's earnings for the same year were $266,879 for a net loss of over $460,000. In previous years, from its inception in 2000 until 2005 (the year before Bires was signed), WalTom spent over $3,000,000 more than it made in its racing enterprise. During just the first two years of WalTom's Driver Development Program (2004 and 2005), WalTom lost at least $854,517 (2004) and $262,642 (2005), respectively. WalTom sold its physical assets, including tool, equipment, trailers, etc., in 2007 to co-defendant TD Racing Development, LLC.

Bires earned $347,610 in 2007. Under the contract with Bires, WalTom would be entitled to royalties of $61,902.50 for 2007, while Bires would retain $285,707.50 for the same year. For 2008, Bires grossed $508,598.49, of which WalTom's royalty would be $102,149.62. According to Bires, this latter amount represented 44% of Bires' after-tax income as reported on his 2008 tax return.

During the 2007 and 2008 racing seasons, Bires raced "successfully" in races in the "high-level" Craftsman Truck and Busch Series of NASCAR. While Bires states that these wins were "through no effort of WalTom," WalTom contends that part of Bires' success is based in part on his driving with them and "participation in WalTom's Driver Development Program." Bires further states that in addition to generating earnings for WalTom, he provided value to WalTom by working "upwards of sixty hours per week" in WalTom's race shop.

Although not expressly stated, WalTom apparently did not renew the Agreement with Bires after the end of the 2006 racing season.

## II. Standards

Plaintiff's Motion for Judgment on the Pleadings. Under Rule 12(c), "a party can move for judgment on the pleadings after the filing of the complaint and answer." *Supreme Laundry Serv., LLC v. Hartford Cas. Ins. Co.*, 521 F.3d 743, 746 (7th Cir. 2008). A motion for judgment on the pleadings should be granted "only when it appears beyond a doubt that the plaintiff cannot prove any set of facts to support a claim for relief and the moving party demonstrates that there are no material issues of fact to be resolved." *Id.* In deciding the motion, the court must take the facts alleged in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *Pisciotta v. Old Nat'l Bancorp*, 499 F.3d 629, 633 (7th Cir. 2007).

Defendants' Motion for Summary Judgment. Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The existence of a factual dispute is not sufficient to defeat a summary judgment motion, instead the non-moving party must present definite, competent evidence to rebut the movant's asserted facts. *Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 924 (7th Cir. 2004).

## III. Plaintiff's Notice of Supplemental Authority

On August 27, 2009, the plaintiff sent a letter attaching briefs from the summary judgment filing in a 1990 case, *New Medico Assocs. v. Kleinhenz*, No. 90 C 6782 (N.D. Ill.), stating that the briefs were "supplemental authority." The plaintiff then directs the court to various pages of the briefs and the exhibits. The plaintiff, however, did not receive leave of court to submit this information to the court; thus, the court will not consider it in addressing the motions currently before it.

## IV. Analysis

A. Count I–Illinois Wage Assignment Act

Bires' first count claims that Section 5 of the Driving Agreement violates the Illinois Wage Assignment Act, 740 ILCS § 170/1 for a variety of reasons, and as a result of the noncompliance, the "wage assignment provision" (i.e., Section 5) is unenforceable. Section 5

states as follows:

> For a period of ten (10) years after Driver ceases driving for WalTom Driver shall pay royalties to WalTom in the amount of twenty-five percent (25%) of all Future Race-Related Earnings defined as follows: Future Race-Related are any and all gross monies or other consideration earned or received at any time by or on behalf of Driver as a result of Driver's activities in and throughout the Racing Industries.

The Driving Agreement further exempted the first $100,000 of Driver's Future Race-Related Earnings.

The Illinois Wage Assignment Act states as follows:

> No assignment of wages earned or to be earned is valid unless:
>
> (1) Made in a written instrument (a) signed by the wage-earner in person and (b) bearing the date of its execution, the social security number of the wage-earner, the name of the employer of the wage-earner at the time of its execution, the amount of the money loaned or the price of the articles sold or other consideration given, the rate of interest or time-price differential, if any, to be paid, and the date when such payments are due;
> (2) Given to secure an existing debt of the wage-earner or one contracted by the wage-earner simultaneously with its execution;
> (3) An exact copy thereof is furnished to the wage-earner at the time the assignment is executed;
> (4) The words "Wage Assignment" are printed or written in bold face letters of not less than 1/4 inch in height at the head of the wage assignment and also one inch above or below the line where the wage-earner signs that assignment;
> (5) Written as a separate instrument complete in itself and not a part of any conditional sales contract or any other instrument.

740 ILCS § 170/1.

Bires goes to great lengths in an attempt to demonstrate that the royalties provision is a statutory wage assignment. Bires concludes that because the royalties provision does not comply with the provisions of the Wage Assignment Act, it is invalid. Focusing on the opening phrase of the statute, which states that "[n]o assignment of wages earned or to be earned is valid unless . . . ," Bires argues that because the term "assignment" is not defined in the Act, the court must give the term its plain and ordinary meaning. *Gekas v. Williamson*, --- N.E.2d ----, 2009 WL 2185509, at *5 (Ill. App. Ct. Jul. 20, 2009)("Except when the statute provides a special definition, we give words their plain and ordinary meaning, including words in the special definitions.")(citation omitted). Bires argues that the Illinois Appellate Court has previously stated in the context of considering a statutory interpretation issue that "[a]ssignment is defined as '[t]he transfer of a claim, right, interest, or property.'" *People v. Wehrwein*, 568 N.E.2d 1, 5

(Ill. App. Ct. 1990)(citation omitted). Thus, Bires' argument goes, because the royalties provision transfers (i.e., assigns) his wages to the defendants, it is a statutory wage assignment, which must comply with the statutory requirements noted above. Because it does not, Bires contends, it is invalid.

WalTom, on the other hand, asserts that the royalties provision in Section 5 is not a wage assignment because it does not secure a debt. *See Cobb v. Monarch Finance*, 913 F. Supp. 1164, 1178 n.18 (N.D. Ill. 1995)("the IWAA only covers those wage assignments used as collection remedies upon default"). In support of its position, WalTom also points to a bankruptcy court decision in this district which described the history of the Illinois Wage Assignment law as follows:

> Before the FTC regulations in 1984, Illinois wage assignments were "a customary form of security required of an employee seeking credit either from pawnbrokers, installment plan merchants, wageloan corporations, small loan companies, so-called 'loan sharks,' and others." Under a typical wage assignment, a debtor assigned future wages to secure a debt. . . . The principal feature of a wage assignment is that it allows a creditor, upon the debtor's default, to satisfy the indebtedness without going to court.

*In re Rosol*, 114 B.R. 560, 563 (Bkrtcy. N.D. Ill. 1989)(internal citations omitted). WalTom contends that there was no debt and therefore there could be no wage assignment.

Based on the statements by the other courts of this district, this court agrees that the royalties provision does not fall within the ambit of the wage assignment statute. There is no evidence that Bires assigned his wages to secure an existing debt. Moreover, Bires did not "assign" his wages to WalTom such that WalTom would have recourse against Bires' future employers to collect on a debt. *See, e.g., Bell Howell Company v. George Spoor*, 225 Ill. App. 256, 1922 WL 2473, at *4 (Ill. App. Ct. 1922)("An agreement to pay out of a particular fund is not an assignment of such fund, or of any portion thereof. To constitute such an assignment, the assignor must not retain control over the fund, and the transaction must be such that the fundholder may safely pay the assignee."). Rather, Bires simply agreed to pay an amount *equal to* 25% of all future race related earnings. Because the royalties provision is not a wage assignment that is covered by the Act, Bires' motion for judgment on the pleadings is denied and WalTom's motion for summary judgment is granted on this count.

B. Count II–Adequacy of Consideration

In Count II of the FAC, Bires alleges that the Driving Agreement is null and void because it is not supported by consideration. Bires moves for judgment on the pleadings with respect to this claim and WalTom moves for summary judgment.

"Any act or promise that benefits one party or disadvantages the other is sufficient consideration to support the formation of a contract." *Cincinnati Ins. Co. v. American Hardware*

*Mfrs. Ass'n*, 898 N.E.2d 216, 230 (Ill. App. Ct. 2008)(citation and internal quotation marks omitted). As noted by one court:

> A court's inquiry into whether a contract is supported by consideration does not extend to examining the adequacy of the consideration. It is not a court's function to review the amount of consideration unless the amount is so grossly inadequate as to shock the conscience of the court. Mere inadequacy of consideration, in the absence of fraud or unconscionable advantage, ordinarily is insufficient to justify setting aside a contract.

*Gavery v. McMahon & Elliott*, 670 N.E.2d 822 (Ill. App. Ct. 1996)(internal citations omitted).

Bires asserts that the Agreement fails for lack of consideration because while WalTom agreed to pay Bires a salary and to pay certain expenses, "the Agreement makes these purported payment obligations entirely optional to WalTom to perform or not perform." Bires' Motion for Judgment on Pleadings, Dkt. #93, at 4 (*citing* Agreement, at ¶ 2)(WalTom had to pay "at its sole discretion and subject to termination at-will by WalTom at any time"). Essentially, Bires argues that WalTom's promises were illusory and because it could terminate the contract at its sole discretion, the Agreement lacked mutuality.[3]

"[A] contract which contains language making it expressly terminable at the will of one party can fail for lack of mutuality of obligation . . . ." *Tibor Mach. Prods. v. Freudenberg–Nok G.P.*, No. 94 C 7635, 1996 WL 535338, at *2 (N.D. Ill. Sept. 19, 1996)(citing *Gordon v. Bauer*, 532 N.E.2d 855, 864 (Ill. App. Ct. 1988). However, "even assuming the mutuality requirement was not satisfied at the contract's inception, it is a well settled rule of law that want of mutuality of obligation is no defense where the contract is executed or where . . . a party who was not bound to perform does perform." *Gordon,* 532 N.E.2d at 864 (citation omitted). *See also McInerney v. Charter Golf, Inc.*, 680 N.E.2d 1347, (Ill. 1997)(rejecting employer's claim that

---

[3]Even prior to getting to the consideration or mutuality issues, the court notes that the provision stating that the Agreement is "at-will" as to WalTom (""WalTom at its sole discretion and subject to termination at-will by Wal-Tom at any time . . . ") such that WalTom could terminate it at any time appears at odds with the express statement of a term–specifically, that it "shall commence January 1, 2006 and shall run through the last scheduled ASA race in 2006. WalTom shall have the option to renew this Agreement for the 2007 ASA racing season or any part thereof." Agreement at ¶ 3. As noted by the Seventh Circuit, "employment at will is . . . one in which a particular duration ('at will') is implied in the absence of a contrary expression . . . ."). *Jordan v. Duff and Phelps, Inc.*, 815 F.2d 429, 438 (7th Cir. 1987)(citation omitted). *See also Blount v. Stroud*, --- N.E.2d ----, 2009 WL 1814593, at *7 (Ill. App. Ct. Jun. 24, 2009)("[A]t-will employees lack a fixed duration of employment . . . ."). It is unclear to the court how the Agreement could on the one hand provide for a set term for the 2006 racing season but on the other hand be terminable at-will by WalTom at its sole discretion. The parties, however, have not addressed this issue and so the court will not either.

employee's promise to continue working was illusory because the employee could quit at any time, noting that employee continued to work for several years and stating that "'where there is any other consideration for the contract mutuality of obligation is not essential'")(citation omitted). The parties do not dispute that WalTom performed under the contract and paid Bires for the 2006 racing season.[4] Thus, WalTom contends that because it performed by paying Bires during the period that he drove for them and courts do not generally analyze the sufficiency of consideration, the inquiry is over and the court should reject Bires' assertion that the contract fails for lack of consideration.

However, Bires asserts that while WalTom may have performed by paying Bires his salary and other payments owed him based on Bires' performance under the contract, the relevant question here is whether there was sufficient consideration for the ten-year royalties provision, which Bires refers to as a restrictive covenant.

"In the context of postemployment restrictive covenants, Illinois courts depart from the traditional rule that the law does not inquire into the adequacy of consideration, only its existence." *Brown & Brown, Inc. v. Mudron*, 887 N.E.2d 437, 440 (Ill. App. Ct. 2008)(citation omitted). "This departure results from the courts' recognition that a promise of continued employment may be an illusory benefit where the employment is at will." *Id*. (citation omitted). In *Brown & Brown*, the court held that seven months of an employee's continued employment was insufficient consideration to support a post-employment restrictive covenant when the employment was at-will. *Id.* at 441. Bires was employed by the defendant only for the "2006 racing season." Neither party states how long the 2006 racing season lasted, but it appears undisputed that it was less than one year. Based on that length of time, the court concludes that less than one year of employment constitutes insufficient consideration for the royalties provision. *Id*. at 440 (" Illinois courts have generally held that two years or more of continued employment constitutes adequate consideration.")(citations omitted).

WalTom attempts to distinguish *Brown & Brown* on two grounds. First, it argues that *Brown & Brown* applies only to the situation where an employer attempts to amend or change an existing employment relationship. However, as noted by Bires, the Seventh Circuit has rejected the distinction between pre and post-hire covenants. *Curtis 1000, Inc. v. Suess*, 24 F.3d 941, 947 (7th Cir. 1994)("continued employment for a substantial period is good consideration for the covenant and the only effect of drawing a distinction between pre-hire and post-hire covenants would be to induce employers whose employees had signed such a covenant after they started working to fire those employees and rehire them the following day with a fresh covenant not to compete"). Thus, the court rejects Wal-Tom's attempt to distinguish *Brown & Brown* on this ground.

Wal-Tom also argues that the provision is not a post-employment restrictive covenant.

---

[4]Though Bires does contend that, contrary to the terms of the Agreement, WalTom did not fully reimburse him for his expenses while he drove for them.

For the reasons stated in the next section, the court agrees with Bires that the royalties provision at issue, while not stated expressly as a covenant not to compete, is subject to the same analysis as restrictive covenants under Illinois law. Thus, because the court concludes that the royalties provision is subject to the same requirements as a covenant not to compete, the court rejects WalTom's second basis for distinguishing *Brown & Brown*, *i.e.*, that the instant case does not deal with a restrictive covenant.

Accordingly, the court grants Bires' motion for judgment on the pleadings and denies WalTom's motion for summary judgment on this issue.

      C.      <u>Count III</u> – Illinois Restraint of Trade

        1.      *Is it a restraint of trade?*

Count III of the FAC alleges that the royalties provision is an illegal restraint of trade. According to Bires, even if sufficient consideration existed for the royalties provision, it constitutes an illegal restraint of trade and "penalizes [Bires] severely for working in any capacity in his profession and for working in numerous unrelated professions. . . ." FAC ¶ 64. Bires moves for judgment on the pleadings with respect to this claim.

WalTom disagrees and moves for summary judgment asserting that the royalties provision contains no activity restriction and is not an illegal restraint of trade because it does not prohibit Bires from working and has not "penalized" Bires. The court notes that WalTom does not address this issue in its reply in support of its motion for summary judgment.

As the Illinois Appellate Court has noted, "[p]ostemployment restrictive covenants typically involve agreements by a past employee not to compete with the business of her former employer, not to solicit clients or customers of her former employer, and not to disseminate trade secrets of her former employer." *Coady v. Harpo, Inc.*, 719 N.E.2d 244, 250 (Ill. App. Ct. 1999).

However, as noted by one prominent contract treatise, "[w]here, although there is no covenant not to compete, a penalty is provided in case the employee engages in the same business after termination of his employment, the rules applicable to covenants against competition should be applied." 6 Williston on Contracts § 13:13. Indeed, Bires points to cases outside Illinois in support of his contention that the royalties provision should be considered an illegal restraint of trade. For example, in *Peat Marwick Main & Co. v. Haass*, 818 S.W.2d 381, 385-86 (Tex. 1991), the partnership agreement at issue provided that if a partner who terminates or is terminated solicits the former partnership's clients within 24 months after the termination, the former partner had to pay (1) in full "all fees and expenses, billed or unbilled, due to the Firm as of the date that the Firm learned that the client would be served by the former partner" as well as (2) reimburse the Firm "for all direct costs (out of pocket expense) paid or to be paid by the Firm in connection with the acquisition of such client. . . ." *Peat Marwick*, 818 S.W.2d at 383. The court concluded that this provision was subject to the same standards of reasonableness as a restrictive covenant noting in part that "[i]f the damages provided are sufficiently severe, then the

economic penalty's deterrent effect functions as a covenant not to compete as surely as if the agreement expressly stated that the departing member will not compete." *Id*. at 385. *See also Leon M. Reimer & Co., P.C. v. Cipolla*, 929 F. Supp. 154 (S.D.N.Y. 1996)(agreement provision requiring employee to pay his former employer 1 1/2 times the employer's annual gross fees charged to such client in the event that the employee accepted an engagement from the client within two years of his termination was analyzed as a covenant not to compete).

But would Illinois courts agree? As an initial matter, Illinois "recognize[s], as a general rule, that the right of an individual to follow and pursue a particular occupation for which he is best trained is a fundamental right and that one who has worked in a particular field cannot be compelled to erase from his mind all of the general skills, knowledge and expertise acquired through his experience." *Smith Oil Corp. v. Viking Chemical Co.*, 468 N.E.2d 797, 800 (Ill. App. Ct. 1984)(*citing ILG Industries, Inc. v. Scott*, 49 Ill.2d 88, 93, 273 N.E.2d 393). Moreover, "[g]enerally, an employee whose employment has terminated may not take confidential particularized plans or processes developed by his employer, but may take generalized skills and knowledge acquired during his tenure with the former employer." *Id*. (citation and internal quotation marks omitted).

WalTom does not assert that it is attempting to protect confidential information or trade secrets learned by Bires while he was in their employ. Rather, it contends that it wants to reap the benefits of its investment, stating that "the royalties provision is a bargained-for return on WalTom's investment in Bires." Response to Bires Motion for Judgment on the Pleadings, Dkt. #101, at 12 (internal quotation marks omitted). The court construes this statement as asserting that because the parties were free to contract, the provision should stand. But the one Illinois case that this court was able to locate that addresses a similar issue (*i.e.*, whether a provision stating that former insurance agent would forfeit renewal premiums of approximately $63,250 if he represented any other life insurance company in Illinois or the surrounding 11-state area), not only concluded that such a provision was a restraint of trade, but in the process rejected the "free to contract" argument. *See Johnson v. Country Life Ins. Co.*, 300 N.E.2d 11, 14 (Ill. App. Ct. 1973). The *Johnson* court stated that:

> The fact that the parties are 'free to contract' does not, in and of itself, operate to bestow legitimacy upon each and every provision contained in the instrument. The cases completely prohibiting the employee from pursuit of his occupation for a period of time in a specified area also arise from contract provisions into which the parties were 'free to enter'. In such cases the courts of this State have not inclined to the view that the freedom and right to contract removes from scrutiny the provisions of the contract when it is charged that they are in restraint of trade. . . . We do not agree with the proposition that since the parties are free to contract concerning renewal premiums, it necessarily follows that the provisions are not in restraint of trade.

*Id*. at 14-15 (internal citations omitted).

Nor did the *Johnson* court accept the contention (which WalTom echoes here) that the renewal forfeiture provision was not a restraint of trade because it did not act to prohibit the employee from working for or engaging in any competing business. The *Johnson* court disagreed with this analysis "for the reason that it seems . . . to be based upon concepts completely divorced from practical reality." The *Johnson* court stated that:

> True, the terminated employee cannot be restrained, *i.e.*, enjoined, from pursuing his occupation nor is he obligated to refrain from so doing, but this is only half the problem. If he does elect to engage in his occupation what consequences follow as a result of the contractual provision? He forfeits his right to commissions which he would have received but for the contractual terms, and this after he has performed all of the services required of him during his relationship with the defendant. . . .The contract clearly extracts a penalty of significant proportions in the event that plaintiff seeks to engage in his occupation.

*Id*. at 15. The *Johnson* court ultimately concluded that the renewal forfeiture provision was in restraint of trade. *Id.* at 15.

In *Johnson*, the plaintiff "testified that he could reasonably expect to receive $63,250.00 in renewals from business that was 'already on the books' when he was terminated." *Id.* at 12. Here, it is undisputed that WalTom estimated that at the time the Driving Agreement was executed it could earn about $7 million from Bires pursuant to the royalties provision. If $63,250 was a sufficient penalty in 1973 to constitute a restraint of trade, then $7 million in 2006, the year the Driving Agreement was executed, most certainly is.[5] Based on the court's holding in *Johnson*, the court concludes that the royalties provision imposes a sufficient penalty such that it is subject to the same reasonableness requirements as a covenant not to compete.

### 2. *Is the royalties provision reasonable*?

Bires argues in his motion for judgment on the pleadings that the royalties provision is invalid because it: (1) does not contain a geographic restriction; (2) extends for an excessive period of ten years; and (3) applies to services of the employee wholly unrelated to the employer's business. Interestingly, WalTom fails to address this argument entirely in its response to the motion for judgment on the pleadings or its briefing in support of its own motion for summary judgment. Accordingly, the court will rule without the benefit of WalTom's views on this issue.

As noted by another court in this district:

---

[5]$63,250 was worth approximately $286,866.14 in 2006 (the year the Driving Agreement was executed), using the Consumer Price Index as a measure of relative worth. *See* http://www.measuringworth.com/uscompare/ (last visited September 10, 2009).

Page 12

Illinois law requires that in order to be enforceable, a covenant not to compete must secure a "protectable interest" of the employer. Illinois courts recognize at least two such protectable interests: (1) where the customer relationships are near-permanent and but for the employee's association with the employer the employee would not have had contact with the customers; and (2) where the former employee acquired trade secrets or other confidential information through his employment and subsequently tried to use it for his own benefit.

Restrictive covenants should be narrowly tailored so as only to protect the protectable interest of the employer. In particular, the time and geographic limitations must be reasonably necessary to protect a legitimate business interest of the employer.

*Mintel Intern. Group, Ltd. v. Neergheen*, 08 C 3939, 2008 WL 2782818, at *4 (N.D. Ill. Jul. 16, 2008)(citations omitted). WalTom fails to point to any protectable interest nor can the court discern any.

Moreover, even if a protectable interest existed, the minimum ten-year term of the royalties provision and the fact that it lacks any geographic limitation render it invalid. *See Quixote Transp. Safety, Inc. v. Cooper*, 03 C 1401, 2004 WL 528011, at *6 (N.D. Ill. Mar. 12, 2004)("[T]he agreement cannot be enforced if it does not place reasonable limitations on the duration of the restriction")(citing *EEOC v. Severn Trent Services, Inc.*, No. 03-2631, 2004 WL 235271 (7th Cir. Feb.10, 2004)(stating a non-compete clause "would be unenforceable if its duration were 'unreasonable,' as it might be under Illinois law ... if it exceeded two or three years, and almost certainly if it exceeded five" years); *Fisher Investments, Inc. v. Carlson*, 04 C 6619, 2004 WL 2496474, at * (N.D. Ill. Nov. 2, 2004)("The lack of . . . a geographical . . . limitation suggests that the covenant would be unenforceable under Illinois law.")(citations omitted). This is particularly true in light of the lack of a reasonableness as to the scope of the prohibited business activity. *Business Records Corp. v. Lueth*, 981 F.2d 957, 961 (7th Cir. 1992)("To support the reasonableness of the covenants, BRC must also show "that the restriction is reasonable as to time, geographical area and scope of prohibited business activity."). As stated in the agreement, WalTom is to receive, for a period of ten years,[6] 25% of all "gross monies or other consideration earned or received at any time by or on behalf of Driver as a result of Driver's activities in and throughout the Racing Industries." Driving Agreement, ¶ 5. Racing Industries, in turn, is defined as:

[W]ithout limitation, all aspects of racing, driving, appearances, sponsorships, endorsements, managed investments, entertainment, amusement, music,

---

[6] The term of the royalties provision is ten years except that if Bires did not race at the level of a "Professional Race Car Driving" level for ten consecutive years, the agreement provided that the term "shall be extended until the Driver's Future Race-Related Earnings exceeds $200,000 annually for a total of ten (10) years."

> recording, songwriting, publishing, internet publishing, television, motion picture, nightclub, concert, radio and theatrical industries, and shall include any and all forms of advertising, merchandising, or other exploitations using Driver's name, photograph, voice, sound effects, likeness, caricatures, talents or materials.

*Id*. Thus, the Agreement reaches not just into Bires' race winnings but any income derived from entertainment or music or publishing, among others, whether or not the activity is related to racing. This is not reasonable.

Accordingly, because the court finds the terms of the royalties provision to be unreasonable, the court grants Bires' motion for judgment on the pleadings and denies WalTom's motion for summary judgment on this count.

### D. Count IV – Unconscionability

Wal-Tom moves for summary judgment on the unconscionability count.

In Count IV, Bires alleges that the royalties provision of the Driving Agreement is procedurally unconscionable because: (1) WalTom failed to inform Bires that the royalty provision was a condition of the parties' relationship until Bires had no other viable option to race for any team during 2006; (2) WalTom coerced Bires into signing the Driving Agreement by falsely telling Bires that if he did not sign it, the parties' prior oral contract would end immediately and Bires would be replaced by another driver; (3) WalTom did not offer Bires a fair opportunity to negotiate the terms of the Driving Agreement; and (4) WalTom had grossly superior bargaining power to Bires. Bires further alleges that the royalties provision is substantively unconscionable because: (1) the royalties provision was completely one-sided in that WalTom's obligations were completely discretionary and WalTom could terminate the contract at any time with or without cause; and (2) the royalties provision is "overly harsh" to Bires and results in a windfall to WalTom.

"A finding of unconscionability may be based on either procedural or substantive unconscionability, or a combination of both." *Kinkel v. Cingular Wireless LLC*, 857 N.E.2d 250, 263 (Ill. 2006)(citation omitted).

"Procedural unconscionability refers to a situation where a term is so difficult to find, read, or understand that the plaintiff cannot fairly be said to have been aware he was agreeing to it . . . ." *Id*. at 264 (citation and quotation marks omitted). "This analysis also takes into account the disparity of bargaining power between the drafter of the contract and the party claiming unconscionability." *Id.* (citation omitted). As for substantive unconscionability, the Illinois Supreme Court has stated that:

> Substantive unconscionability concerns the actual terms of the contract and examines the relative fairness of the obligations assumed. Indicative of substantive unconscionability are contract terms so one-sided as to oppress or

unfairly surprise an innocent party, an overall imbalance in the obligations and rights imposed by the bargain, and significant cost-price disparity.

*Id*. at 267 (citation and quotation marks omitted).

However, as noted by WalTom:

A contract is not unconscionable merely because it appears to be unfair. The contract must be totally one-sided or oppressive, one "which no man in his senses, not under delusion, would make, on the one hand, and which no fair and honest man would accept on the other."

*In re Marriage of Lee*, 481 N.E.2d 1045, 1048 (Ill. App. Ct. 1985)(citations omitted). Moreover:

No equitable principle, including unconscionability, will compel the cancellation of a valid contract merely because one of the parties thereto will possibly or probably sustain a loss. Where the parties to an instrument are competent to contract with each other, and there is no question of fraud, neither can be relieved from his agreement on the ground that he did not use good business judgment in entering into the contract.

*Bond Drug Co. of Illinois v. Amoco Oil Co.*, 654 N.E.2d 540 (Ill. App. Ct. 1995)(citation omitted). Finally, "mere disparity of bargaining power is not sufficient grounds to vitiate contractual obligations." *Streams Sports Club, Ltd. v. Richmond*, 457 N.E.2d 1226, 1232 (Ill. 1983)(citation omitted).

1. *Procedural*

Bires contends that the royalties provision is procedurally unconscionable because (a) WalTom failed to inform Bires of the provision before he began to work for WalTom; and (b) Bires executed the Agreement as a result of WalTom's pressure, coercion, exercise of superior bargaining power, and preclusion of a fair opportunity to negotiate. In its reply brief, WalTom failed to respond to this argument or point to any record evidence demonstrating that the agreement is procedurally conscionable. Accordingly, the court denies WalTom's motion for summary judgment regarding the claim of procedural unconscionability.

2. *Substantive*

Bires asserts that the agreement was substantively unconscionable because: (1) the agreement is imbalanced as it obligates Bires in numerous ways while WalTom was only required to pay Bires a salary of $2800 a month and small incentives and even then, WalTom had the unilateral ability to terminate the contract at any time with or without cause; (2) the royalties provision is oppressive to Bires; and (3) the respective value to WalTom and Bires is significantly different.

Page 15

WalTom responds that the agreement was not substantively unconscionable because the royalties provision provided that the first $100,000 of Bires' race-related earnings each year were exempt from royalties. WalTom also asserts that it took a risk that it would not receive any future royalties and that a "myriad of factors could affect Bires' earnings in the industry." Reply at 9. WalTom compares itself to a personal injury plaintiff's attorney operating under a one-third contingency agreement stating that "[i]t took a risk on a driver, and invested a substantial amount of money to run a competitive race team" and gave Bires "an opportunity and a working environment to excel, and took the risk of earning no future royalty whatsoever." Reply at 10.

But WalTom's comparison, even if on point, is of limited assistance because even contingency fee agreements are subject to requirements of reasonableness and unconscionability. *See, e.g.*, *Kouba v. Joyce*, 83 C 451, 1987 WL 33370 (N.D. Ill. Dec. 31, 1987)(citation omitted)("Under the common law, contingency fee agreements are generally valid and enforceable unless they are unconscionable or are procured by fraud, mistake, or overreaching.").

In any event, because any cost-price disparity is relevant to the substantive unconscionability argument and the costs incurred by WalTom in outfitting Bires as a driver for the 2006 racing season are subject to a factual dispute, *see* Plaintiff's Response to WalTom's Statement of Fact, ¶ 25, the court denies Wal-Tom's summary judgment motion.

E.  Count V –Violation of the Illinois Consumer Fraud Act

The fifth count of the FAC alleges a violation of the Illinois Consumer Fraud and Deceptive Practices Act, 815 ILCS § 505/2. Bires alleges, among other things, that WalTom: (1) engaged in unfair and deceptive acts by offering for sale and selling its services to instruct, mentor and provide financial support to Bires when WalTom had no intention of doing so, (2) concealed the fact that a condition of the arrangement between the parties was that Bires would pay 25% of his future gross racing income for the next decade; (3) enticed Bires through misrepresentations and omissions to "deepen his relationship" with WalTom and forego other opportunities such that he had no other option but to sign the Driving Agreement with the royalties provision; (4) coerced Bires into signing the purportedly unfair Driving Agreement; (5) falsely represented that if Bires did not immediately sign the Driving Agreement, then his preexisting oral employment agreement would immediately end; and (6) sought to collect on the royalties provision without having provided services or other consideration to Bires.

WalTom argues that Bires is essentially alleging that it failed to abide by a prior oral agreement and notes that the Seventh Circuit has held that alleged unfulfilled contractual promises do not support a claim under the Consumer Fraud Act. *Shaw v. Hyatt International Corp.*, 461 F.3d 899 (7th Cir. 2006)("Were our courts to accept plaintiff's assertion that promises that go unfulfilled are actionable under the Consumer Fraud Act, consumer plaintiffs could convert any suit for breach of contract into a consumer fraud action.").

However, as noted by Bires, his claim is not based exclusively on WalTom's alleged failure to fulfill contractual obligations. Contrary to WalTom's assertion, simply because Bires

Page 16

refers to the Agreement in reciting certain claims does not make the claim contract-based. For example, Bires alleges that WalTom concealed, suppressed and failed to inform him until after he had moved to Wisconsin that a condition of his employment would be that he pay the defendant 25% of his race-related income for the next ten years, and that WalTom pressured and coerced Bires to sign the written agreement between the parties, among others. Thus, because Bires' ICFA claim is not strictly contract-based, and this is the only argument WalTom makes in support of its motion for summary judgment as to this count, the court denies WalTom's motion for summary judgment on this claim.

      F.      <u>Count VI</u> – Lack of Capacity

In Count VI, Bires alleges that WalTom did not have the capacity to enter into the Driving Agreement. Specifically, Bires asserts that while the Driving Agreement indicates it is between Bires and "WalTom Racing, LLC," at the time the Driving Agreement was executed, "WalTom Racing, LLC" was not an entity organized under the Illinois Limited Liability Act or any other law of the State of Illinois, and therefore "WalTom Racing, LLC" had no capacity to contract.

According to WalTom, it is entitled to summary judgment on this count because while WalTom Racing, LLC, the entity named in the *preamble* to the Agreement did not exist, WalTom, LLC, the entity that signed the Driving Agreement, did exist at the time that the Driving Agreement was executed. Thus, WalTom asserts that any argument that WalTom Racing, LLC lacked the capacity to enter into the Driving Agreement should be rejected. *In re GGSI Liquidation Inc.*, 351 B.R. 529, 565 (Bkrtcy. N.D. Ill. 2006) ("Obligations and promises of parties in the operative portion of the contract prevail over a preliminary recital or preamble.").

Here, Bires is attempting to escape the strictures of the contract by arguing a technicality–that because WalTom Racing LLC, which is named in the preamble and which was designated "WalTom" for the remainder of the contract was not organized under the Illinois Limited Liability Act at the at the time of the contract, the Agreement is void. The court rejects Bires' argument for several reasons. First, the signature line on the contract indicates that it is being entered into by WalTom LLC, the correct entity that entered into the contract and was properly organized under Illinois law. In addition, Bires fails to point to any evidence indicating that the technical deviation in the preamble and body of the contract affected anyone's understanding or performance under the contract or that two different entities were actually involved. *See Marquette Nat. Bank v. B.J. Dodge Fiat, Inc.*, 475 N.E.2d 1057 (Ill. App. Ct. 1985)(concluding that slightly different names on note and demand account did not prevent garnishor from garnishing finds in account and noting that "[t]here is no contention, yet along any evidence, that two different corporations are actually involved or even that different corporate officers are involved. The two names, only slightly different from one another, represent the same entity, and thus this creates no bar to [the plaintiff's] garnishment of the demand account"). *See also Malleable Iron Range Co. v. Pusey*, 91 N.E. 51, 54 (Ill. 1910)(acknowledging with approval that "[t]here is a general concurrence of modern authority to the effect that a misnomer or variation from the precise name of the corporation in a grant or

obligation by or to it is not material if the identity of the corporation is unmistakable, either from the face of the instrument or from the averments and proof.")(citation and internal quotation marks omitted).

Finally, the cases Bires points to in support of his position are inapposite. In *Serpe v. Williams*, 776 F. Supp. 1285 (N.D. Ill. 1991), wives of four men signed, as spouses, an agreement that "had strenuous requirements which, if satisfied, would have entitled the club member [i.e., the four men] to become a Regional Vice President and thereafter earn a substantial income." *Id*. at 1287. While "[t]he contract spell[ed] out in great detail the requirements of club membership, . . . there [wa]s no promise, duty, or obligation of any spouse nor is there reference to the spouse other than a signature line." *Id*. The court concluded that, despite the fact that they had signed the contract, the wives were not parties to the contract because, in main part, the contract enumerated no responsibilities for the wives. The only mention of the women came at the signature line, which the court found "insufficient to indicate an intent to make the wives parties to an otherwise very detailed agreement." *Id*. at 1288. Here, however, Bires does not dispute that WalTom LLC is a party to the contract–the simple question is whether the fact that WalTom LLC is referred to by a slightly different name in the body of the contract requires that the contract be deemed void, to which this court has answered no.

*Anzalone v. Durschlag*, 273 N.E.2d 752 (Ill. App. Ct. 1971), is equally unavailing for Bires. In *Anzalone*, the defendant essentially made up a name of a new company that he purportedly formed with another individual to perform painting services. The new company, however, was not a legal corporation or a partnership, and "did not have a checking account, a tax return, employees, a social security number, or a bank account separate from those of Chicago Camcorp, Inc. [the corporation of which the company was purportedly a division]" *Id*. at 754. In a contract dispute with another company, the defendant was held personally liable for certain debts incurred by the new company he had formed with the other individual. The court rejected the defendant's contention that he could contract or do business in a trade or fictitious name. In doing so, the court also affirmatively rejected the defendant's attempted reliance on *Malleable Iron Range Co.* stating that that case was "inapposite to the point defendants stress, for it addresses itself to an instance where a corporation's name was improperly stated on a contract. The [*Malleable Iron*] court held that such a misnomer would not invalidate the contract if it could be proven that the identity of the corporation in question was unmistakable and that the corporation was misnamed in the contract by inadvertence." *Id*. at 754. Thus, contrary to Bires position that *Anzalone* supports his position, the court finds the complete opposite to be true.

While WalTom does not point to any evidence that the use of the name WalTom Racing LLC was inadvertent, it points out that Bires' affidavit filed in support of his motion for judgment on the pleadings indicates that he applied for a job "posted by the Defendant WalTom, LLC. . . ." Plaintiff's Statement of Additional Facts, ¶ 32. Moreover, Bires' amended complaint indicates that he negotiated the contract with WalTom, LLC. Amended Complaint at ¶ 29 ("[T]he Plaintiff was providing services to the Defendant as an employee . . . [when] the Defendant submitted a written agreement to the Plaintiff."). Indeed, Bires original complaint filed in state court in North Carolina names the defendant as WalTom, LLC d/b/a WalTom

Page 18

Racing, LLC. Finally, the signature line on the contract lists WalTom, LLC. Each of these indicates that Bires knew that the identity of the contracting entity was WalTom, LLC. The court declines to place form over function and declare the agreement void based on a clear misnomer that did not prejudice Bires.

Accordingly, the court denies his motion for judgment on the pleadings as to this count and grants WalTom's motion for summary judgment as to this count.

      G.      <u>Count VIII</u> –Breach of Forum Selection Clause

Bires' final count is patently ridiculous. In Count VIII, Bires seeks $24,504.36 in attorney's fees as purported damages due to the fact that he had to move to dismiss WalTom's counterclaim in this case based on WalTom's failure to abide by the forum selection clause, which required that "any action to enforce or interpret the terms [of the contract] shall be brought exclusively in the court of Cook County, IL." The court will not detail here the entire tortured procedural history of this case. It is enough to say that WalTom initially filed its case in the Circuit Court of Cook County, but *Bires successfully moved to dismiss WalTom's Illinois case* in favor of a case he had filed in North Carolina. For Bires now to seek attorney's fees for having to move to dismiss WalTom's counterclaim based on a forum selection clause that Bires himself did not honor and which would not have needed to be filed in this court but for Bires' successful motion to dismiss is ludicrous. The court admonishes Bires' counsel that any such future frivolous arguments may result in sanctions. The court grants WalTom's motion for summary judgment as to Count VIII.

## IV.    Conclusion

For the reasons stated herein, the defendants' motion for summary judgment [96-1] is denied as to Counts II, III, IV, and V and granted as to Counts I, VI and VIII. Bires' motion for judgment on the pleadings [93-1] is granted as to Count II and III and denied as to Counts I and VI.

Accordingly, judgment is entered in Bires' favor and against WalTom as to Counts II (Lack of Consideration) and III (Illegal Restraint of Trade). Judgment is further entered in favor of WalTom and against Bires as to Counts I (Illinois Wage Assignment Act), VI (Lack of Capacity), and VIII (Breach of Forum Selection Clause).

This leaves open the following three counts: Count IV–Unconscionability; Count V–Violation of the Illinois Consumer Fraud Act; and Count VII–Breach of Contract Based on WalTom's Failure to Pay Taxes and Expenses. Given that the court has concluded that the contract is null and void because it lacks consideration (Count II) and is an illegal restraint of trade (Count III), the parties are directed to file position papers within 7 days of the date of entry of this order as to the effect of these rulings on the unconscionability count (Count IV), the Illinois Consumer Fraud Act count (Count V), and the breach of contract count (Count VII).

**ENTER:**

**DATE:** September 23, 2009

_____
**Blanche M. Manning**
**United States District Judge**